[No. C058206. Third Dist. Mar. 16, 2011.]

SOUTH SUTTER, LLC, Plaintiff and Appellant, v.
LJ SUTTER PARTNERS, L.P., et al., Defendants and Respondents.

[No. C059554. Third Dist. Mar. 16, 2011.]

SOUTH SUTTER, LLC, Plaintiff and Appellant, v.
ANDERSON WEST, LLC, Defendant and Respondent.

636

638

## COUNSEL

Freidberg & Parker, Edward Freidberg, Port J. Parker, Suzanne M. Alves and Danny A. Barak for Plaintiff and Appellant.

Neasham & Kramer, William C. Neasham and Patricia Kramer for Defendants and Respondents.

## OPINION

**NICHOLSON, Acting P. J.**—Plaintiff in these actions, South Sutter, LLC (South Sutter), owned an option to acquire a large tract of land from defendant Odysseus Farms. South Sutter claimed the option agreement also gave it an exclusive interest in other lands owned by Odysseus Farms and a right of first refusal should Odysseus Farms acquire additional property and enter into a joint venture with third parties regarding the new property.

When Odysseus Farms entered into an agreement with defendant LJ Sutter Partners, L.P. (LJ Sutter), optioning its other lands, and when Odysseus Farms allegedly formed a joint venture with defendant Anderson West, LLC, regarding new property it had acquired, South Sutter sued. It alleged contract and tort causes of action.

South Sutter voluntarily dismissed the complaint, however, after LJ Sutter and its owners filed a special motion to strike the complaint under Code of Civil Procedure section 425.16, more commonly known as an anti-SLAPP motion.[1] LJ Sutter was later awarded its attorney fees for bringing its motion. In awarding fees, the trial court determined on the merits that South Sutter's first complaint was a SLAPP. It arose from the defendants' exercise of constitutional rights of speech and petition regarding governmental development entitlements both South Sutter and LJ Sutter had sought to obtain, and South Sutter failed to prove it would have prevailed on the merits of its complaint.

South Sutter appealed the trial court's attorney fees order to our court. We subsequently dismissed the appeal at South Sutter's request, as the parties had settled their dispute. The parties did not, however, seek a stipulated reversal of the trial court's order.

Meanwhile, shortly after dismissing its first complaint, South Sutter filed a second complaint, which is the subject of these appeals. South Sutter sued Odysseus Farms and its owners for breach of contract, and it sued Odysseus Farms and its owners, LJ Sutter and its owners, and Anderson West for declaratory relief. South Sutter omitted all of the tort causes of action it had alleged in the first complaint.

LJ Sutter and its owners again filed an anti-SLAPP motion. They claimed the second complaint's lack of new facts established that South Sutter's second complaint arose out of the defendants' exercise of constitutional rights.

---

[1] "SLAPP is an acronym for Strategic Lawsuit Against Public Participation. SLAPP litigation, generally, is litigation without merit filed to dissuade or punish the exercise of First Amendment rights of defendants. [Citations.]" (*Lafayette Morehouse, Inc. v. Chronicle Publishing Co.* (1995) 37 Cal.App.4th 855, 858 [44 Cal.Rptr.2d 46].)

They also argued South Sutter was not likely to succeed on the merits of its complaint. The trial court agreed with LJ Sutter and its owners, granted the motion, and dismissed the complaint against those defendants.

Anderson West filed a demurrer to South Sutter's complaint. It argued South Sutter could not allege facts sufficient to state a cause of action against it. The trial court agreed with Anderson West and sustained the demurrer without leave to amend.

South Sutter appeals from both judgments against its second complaint. It claims the trial court erred in granting LJ Sutter's anti-SLAPP motion as the motion was not filed timely, there was insufficient evidence the complaint arose from defendants' exercise of constitutional rights, and there was sufficient evidence South Sutter was likely to succeed on the merits of the complaint.

South Sutter also claims the trial court erred in sustaining Anderson West's demurrer without leave to amend, as it allegedly pleaded sufficient facts to state a cause of action against Anderson West.

We consolidated the appeals for purposes of argument and decision. After we consolidated the appeals, South Sutter informed us it had settled with Odysseus Farms and its owners, who were not parties to this appeal, and it had dismissed them from this action. LJ Sutter and Anderson West then requested we dismiss these appeals as moot.

At oral argument, South Sutter conceded its settlement with Odysseus Farms had rendered the appeal against Anderson West moot. We therefore dismiss case No. C059554 against Anderson West, and we will not discuss that appeal in this opinion.

As to case No. C058206 against LJ Sutter and its owners, we deny the request to dismiss the appeal and we affirm the judgment. We conclude the trial court did not err in granting LJ Sutter's anti-SLAPP motion. The trial court's determination in the attorney fees order that South Sutter's cause of action arose from LJ Sutter's exercise of constitutional rights acts as a direct estoppel and precludes relitigation of that issue here. Even if there was no direct estoppel, the evidence demonstrates South Sutter's cause of action against LJ Sutter arises from the latter's exercise of constitutional rights.

Additionally, the evidence demonstrates it is unlikely South Sutter will succeed on the merits of its complaint against LJ Sutter and its owners. A condition precedent on South Sutter's interest in Odysseus Farms's other

lands, which interest serves as the basis for South Sutter's complaint, has not been satisfied.

## FACTS

A. *Option agreement between South Sutter and Odysseus Farms*

In the mid-1990's, Sutter County (the County) designated in its general plan some 10,500 rural acres located in Sutter County's southeast corner as industrial/commercial reserve. The area became known as the "Industrial Reserve." This designation allowed for employment-related development to occur on the land.

Defendant Odysseus Farms owns approximately 3,800 acres in the Industrial Reserve. Odysseus Farms is a general partnership. Defendant Leal Family Trust is its general partner, and defendant Robert Leal is the trustee of the Leal Family Trust. (We refer to these three defendants collectively as the Leal defendants.)

In 2002, Odysseus Farms granted to LNR California Investments, Inc., the predecessor in interest to South Sutter, an exclusive option to purchase 2,700 acres of its Industrial Reserve land (the Option Agreement).[2] The parties refer to the land optioned under the Option Agreement as the "Option Property." The Option Agreement generally calls for South Sutter to acquire parcels of the Option Property in phases over a 20-year term.

During the term of the Option Agreement, South Sutter has the exclusive right under section 9.1 of the Option Agreement to seek the approval of all governmental entitlements necessary or desirable for its contemplated development of the Option Property. Such entitlements include a specific plan, the resolution of endangered species mitigation issues required for compliance with the Natomas Basin Habitat Conservation Plan, any development agreements with the County, and the recordation of parcel maps and final tract maps for the Option Property. Odysseus Farms agrees to reasonably cooperate with South Sutter and do all that is necessary for South Sutter to obtain or seek approval of development entitlements. In addition, Odysseus Farms agrees not to execute any agreement that would "materially and adversely affect the intended development of the [Option] Property by [South Sutter]."

The Option Agreement also addresses other property owned by Odysseus Farms that exists both within and outside of the Industrial Reserve and that

---

[2] LNR California Investments, Inc., is not a party to this action. For ease of reference, we will refer to it and to plaintiff South Sutter collectively as South Sutter.

surrounds the Option Property. The Option Agreement refers to this property as the "Other Property." Under the Option Agreement, the Other Property could possibly be used by South Sutter to fulfill environmental mitigation requirements imposed on it for developing the Option Property. Section 12.1 of the Option Agreement in general states that, provided Odysseus Farms and South Sutter successfully negotiate a conservation easement in favor of a government agency to satisfy South Sutter's mitigation requirements, South Sutter will have exclusive rights to purchase that conservation easement on the Other Property. The parties anticipated that such an easement would consist of one-half of an acre of the Other Property for every acre of the Option Property South Sutter developed.

Other than to allege the Other Property exists both within and outside of the Industrial Reserve, nothing in the Option Agreement or, for that matter, the record on appeal identifies all of the Other Property or describes its size or specific location.

Odysseus Farms also agrees in the Option Agreement to extend to South Sutter a right of first refusal should Odysseus Farms decide to sell or enter into a joint venture regarding any real property Odysseus Farms acquires within the "specific plan area" for south Sutter County. Under section 13.1 of the Option Agreement, any contract for such a sale or joint venture by Odysseus Farms must be forwarded to South Sutter, which then can determine whether to purchase the property or enter into the joint venture being negotiated. If it chooses not to purchase the property or enter into the joint venture, Odysseus Farms is free to proceed with the sale or joint venture.

B. *Measure M*

In 2004, South Sutter began meeting with County officials to investigate developing the Option Property. At the request of South Sutter and other landowners in the Industrial Reserve, the County Board of Supervisors agreed to place on the ballot an advisory measure for the voters to state whether they approved developing 7,500 acres of the Industrial Reserve. The ballot measure, known as Measure M, proposed developing the land with various uses, including residential and commercial uses, and building the infrastructure needed for that development. The group of landowners who worked to place Measure M on the ballot and who campaigned for its passage became known as the "Measure M Group." South Sutter was part of the Measure M Group; the Leal defendants were not.

The voters approved Measure M in November 2004.

Shortly thereafter, the County determined the proposed boundaries of the 7,500 acres of the Industrial Reserve that would be included in a specific plan

to be adopted to implement Measure M. This was based on the recommendations and plans of the Measure M Group members. The specific plan area included all of the Option Property. South Sutter alleges the specific plan area also included 210 acres of the Other Property owned by Odysseus Farms and a 239-acre tract of land known as the "Brennan Tract." At that time, the Natomas Basin Conservancy, not a party to this action, owned the Brennan Tract.

C. *Option Agreement between Odysseus Farms and LJ Sutter, and acquisition of the Brennan Tract*

In January 2005, Odysseus Farms entered into another option agreement (the Miller Option Agreement), this time with defendant LJ Sutter, by and through LJ Sutter's general partner, defendant Miller Holdings Investments, Inc. (Miller Holdings) (collectively, the Miller defendants). By this agreement, LJ Sutter obtained a 10-year option to purchase all or a portion of the Other Property, including 386 acres of the Other Property known as the "Natomas Bennett Subdivision." Based on a comparison of assessor's parcel numbers provided by South Sutter, it appears the Natomas Bennett Subdivision is not included within the specific plan area. It is otherwise unclear from the record where the Natomas Bennett Subdivision is located.

In 2006, LJ Sutter terminated a portion of the Miller Option Agreement with Odysseus Farms, allegedly as part of an agreement and joint venture for Odysseus Farms and the Miller defendants to obtain the Brennan Tract, which was then owned by the Natomas Basin Conservancy and was within the proposed specific plan area. LJ Sutter quitclaimed its interest in the Natomas Bennett Subdivision back to Odysseus Farms for $1. Odysseus Farms transferred the Natomas Bennett Subdivision to the Natomas Basin Conservancy. The Natomas Basin Conservancy transferred a "50% co-tenancy" fee interest in the Brennan Tract to Odysseus Farms, and another "50% co-tenancy" fee interest in the Brennan Tract to defendant Anderson West, a limited liability company whose managing agent is defendant Miller Holdings, LJ Sutter's general partner.

D. Sutter I *lawsuit*

In March 2007, South Sutter filed a lawsuit in Sutter County Superior Court against the Leal defendants; the Miller defendants; Miller Holdings's president, Larry L. Miller; and John Nicholson, a representative of LJ Sutter. (The parties refer to this action as *Sutter I.*) (Super. Ct. Sutter County, No. CV-CS-07-0578.) South Sutter alleged various contract and tort causes of

action arising from the Leal defendants' entering into the Miller Option Agreement with the Miller defendants, the Leal defendants' acquisition of the Brennan Tract, and actions taken by the Leal defendants and the Miller defendants that interfered with South Sutter's efforts to develop the Option Property.

To better understand the anti-SLAPP motion before us, it is necessary to review *Sutter I*'s allegations in greater detail. In *Sutter I*, South Sutter alleged a dispute had arisen between it and the Leal defendants in November 2004, around the time Measure M passed, regarding the amount of the Leal defendants' land, including the Other Property, which would be included in the Measure M specific plan area. Robert Leal wanted more of the land developed than was contemplated by Measure M. He specifically wanted some of the Other Property that was located outside the specific plan area to be designated for residential land use. The parties could not reach agreement on this matter. Shortly thereafter, Odysseus Farms and Robert Leal entered into the Miller Option Agreement with LJ Sutter for the Other Property.

Afterward, the Leal defendants and the Miller defendants allegedly took steps to oppose South Sutter's development of the Option Property. In February 2005, they proposed to the County a different boundary and development plan for the specific plan area than the one being proposed by South Sutter and the Measure M Group.

In April 2005, Leal refused to sign a consent form on behalf of Odysseus Farms authorizing the Option Property to be within the boundaries of the specific plan area. Leal also called the county administrator to tell him the Option Property could not be planned without Leal's written consent.

In that same month, Leal and Miller appeared before the County's public works/support services committee to oppose a funding agreement which the County required the Measure M Group to sign. The funding agreement was a precondition for the County to begin work on the specific plan, and it required the Measure M Group to reimburse the County for its planning expenses. Miller also spoke with the director of the County's services department (which performs the County's planning functions) and told him that South Sutter did not control the Option Property.

In May 2005, Leal and Miller submitted letters to the board of supervisors opposing the approval of the funding agreement. In those letters, Leal and Miller stated South Sutter did not control the Option Property for purposes of the specific plan effort. Miller also testified at the board's hearing on the funding agreement, and he again stated South Sutter did not control the

Option Property for purposes of obtaining entitlements. Undeterred, the board approved the funding agreement.

In July 2006, South Sutter and the Measure M Group submitted their specific plan application to the County, at a cost to them of approximately $6 million. Nearly six months later, the Leal defendants and the Miller defendants submitted on behalf of LJ Sutter a competing specific plan application to the County. The LJ Sutter plan proposed adding more of the Other Property to the specific plan area and removing some 50 acres of South Sutter's Option Property from the plan area. It also proposed different land uses for the Option Property than those proposed by South Sutter in its specific plan application.[3]

Also in 2006, the Leal defendants, the Miller defendants, and Anderson West consummated their acquisition of the Brennan Tract from the Natomas Basin Conservancy.

South Sutter filed the *Sutter I* complaint in March 2007. It claimed in *Sutter I* that all of these actions by the Leal defendants and the Miller defendants constituted contractual breaches and tortious conduct. It sought damages, including punitive damages, as well as declaratory relief.

Specifically, *Sutter I* accused the Leal defendants of (1) breaching section 12.1 of the Option Agreement, the right to acquire a conservation easement in the Other Property, by entering into the Miller Option Agreement and granting an option in the Other Property to LJ Sutter; (2) breaching section 13.1 of the Option Agreement, the right of first refusal, by acquiring an interest in the Brennan Tract without giving South Sutter its right of first refusal; and (3) breaching section 9.1 of the Option Agreement, the exclusive right to seek development entitlements for the Option Property, by opposing South Sutter's efforts before the County Board of Supervisors and County staff to obtain development entitlements for the Option Property, and in particular by submitting the competing specific plan application.

South Sutter accused the Miller defendants of inducing the Leal defendants to breach the Option Agreement. It also accused all defendants of intentionally interfering with South Sutter's prospective economic advantage. It alleged the Miller defendants committed these torts in part by filing the conflicting specific plan application with the County. It also claimed the Miller defendants made false assertions before the County Board of Supervisors regarding their property interests and in opposing South Sutter's development efforts.

---

[3] The County rejected LJ Sutter's specific plan application on April 24, 2007.

E. *Anti-SLAPP motion in* Sutter I *and motion for attorney fees*

In response to *Sutter I*, the Miller defendants, Miller, and Nicholson on May 14, 2007, filed an anti-SLAPP motion pursuant to Code of Civil Procedure section 425.16.[4] They argued they were entitled to relief because *Sutter I* arose out of their constitutional speech and petition rights. *Sutter I* attacked them for statements they made to the board of supervisors and for filing the competing specific plan application. They also claimed South Sutter could not succeed against them on the merits of the *Sutter I* complaint.

About one week after the Miller defendants filed their anti-SLAPP motion, South Sutter dismissed the *Sutter I* complaint as to all parties and without prejudice.

Subsequently, in August 2007, the Miller defendants filed a motion pursuant to section 425.16 to have themselves declared to be the prevailing parties in their anti-SLAPP motion in *Sutter I* and to recover the attorney fees and costs they incurred from bringing their motion.

Because the trial court had to determine who the prevailing party was on the anti-SLAPP motion in order to resolve the attorney fees motion, the Miller defendants and South Sutter submitted evidence and briefing on the merits of the anti-SLAPP motion.

Although the trial court stated its reference to the merits of the anti-SLAPP motion was only within the context of deciding the attorney fees motion, it nonetheless concluded the Miller defendants were the prevailing parties on the anti-SLAPP motion. They had established the causes of action against them in *Sutter I* arose from their exercise of constitutional rights to petition the government and to free speech. The court also determined that South Sutter had failed to demonstrate a likelihood of success on the merits. It awarded roughly $65,000 in attorney fees to the Miller defendants.

South Sutter appealed the trial court's attorney fees ruling to our court. (*South Sutter, LLC v. LJ Sutter Partners, L.P.* (Aug. 28, 2008, C057843).) However, in 2008, the parties entered into a settlement agreement, and South Sutter requested we dismiss the appeal. We dismissed the appeal and ordered the remittitur to be issued. The parties did not stipulate to a reversal of the trial court's order or seek our approval of such a stipulation.[5]

---

[4] All statutory references are to the Code of Civil Procedure unless designated otherwise.

[5] Pursuant to Evidence Code sections 459 and 452, subdivision (d), we take judicial notice of our records in *South Sutter, LLC v. LJ Sutter Partners, L.P., supra*, C057843. We recognize that we earlier denied South Sutter's petition, and supplemental petition, to take judicial notice of its dismissal of case No. C057843, the parties' settlement agreement, and certain documents

### F. Sutter II *lawsuit*

Meanwhile, back on June 22, 2007, South Sutter filed a new complaint in Santa Clara County Superior Court against the Leal defendants, the Miller defendants, and Anderson West.[6,7] (*South Sutter, LLC v. Odysseus Farms* (Super. Ct. Santa Clara County, 2007, No. 1-07-CV-088499).) The parties refer to this action as *Sutter II*. This appeal arises from the trial court's judgment on the *Sutter II* complaint.

South Sutter filed *Sutter II* about one month after dismissing *Sutter I*, about one month after the County rejected the Miller defendants' specific plan application for filing, and about two months before the Miller defendants filed their motion for attorney fees for the anti-SLAPP motion in *Sutter I*.

In *Sutter II*, South Sutter omitted its tort causes of action that had been included in *Sutter I*. It also omitted all of its prior allegations from the *Sutter I* complaint regarding any activities by defendants opposing South Sutter's development of the Option Property, including any references to the Leal defendants and Miller defendants submitting a competing specific plan application to the board of supervisors or County staff. Other than those changes, *Sutter II* contains no new or additional facts from those alleged in *Sutter I*.

*Sutter II* alleged causes of action only for breach of contract against the Leal defendants and for declaratory relief against the Leal defendants, the Miller defendants, and Anderson West. South Sutter alleged that each defendant acted as the agent of every other defendant, and each was a necessary and indispensible party.

South Sutter claimed the Leal defendants breached section 13.1 of the Option Agreement by failing to provide South Sutter with notice and a right of first refusal to participate in the joint venture with Anderson West for the acquisition, ownership and development of the Brennan Tract.

filed in other legal actions involving the Miller defendants and the Leal defendants. However, it has become apparent to us that our file in case No. C057843 is relevant to this appeal. We thus take judicial notice of it on our own motion.

As to South Sutter's request for judicial notice of the other documents from other lawsuits, the Miller defendants filed a motion to strike South Sutter's opening brief and for sanctions for having to defend against those requests, claiming the documents, liberally cited in South Sutter's original opening brief, were irrelevant to this appeal. We granted the motion to strike the opening brief. The brief now on file no longer references the disputed documents. The Miller defendants continue to press for sanctions. We deny their request. There is no evidence in the record indicating South Sutter sought judicial notice with the intent to mislead the court or for a frivolous purpose.

[6] Miller and Nicholson were not named as parties in this new action.

[7] South Sutter alleged LJ Sutter's principal place of business was in Santa Clara County.

South Sutter sought declaratory relief as to all defendants, claiming disputes had arisen with them regarding, among other matters, (1) whether the Option Agreement grants South Sutter an exclusive right to seek development entitlements for the Option Property and to develop that property; (2) whether the Option Agreement prohibits the Leal defendants, acting solely or through an agent (presumably, the Miller defendants) from seeking development entitlements for the Option Property or attempting to develop the Option Property; (3) whether the Option Agreement prohibits the Leal defendants from entering into agreements, including the Miller Option Agreement, to transfer, sell, or option any of the Other Property; and (4) whether the Option Agreement prohibits the Leal defendants, acting solely or through an agent, from seeking development entitlements for the Other Property.

South Sutter also sought a declaration that Odysseus Farms violated the Option Agreement by entering into the Miller Option Agreement with LJ Sutter for the Other Property. It asked the trial court to declare the Miller Option Agreement void and to nullify or rescind it.

Counsel for defendants objected to *Sutter II*'s choice of venue. By stipulation of the parties, *Sutter II* was transferred to Sutter County Superior Court, where it was received on or about October 23, 2007. (Super. Ct. Sutter County, No. CV-CS-07-2068.)

G. *Miller defendants' anti-SLAPP motion in* Sutter II

More than 60 days after *Sutter II* was filed but less than 60 days after *Sutter II* was received by the Sutter County Superior Court, the Miller defendants filed an anti-SLAPP motion to strike the *Sutter II* complaint as against them.

In their anti-SLAPP motion in *Sutter II*, the Miller defendants argued they had already met their prima facie burden of showing *Sutter II* arose out of constitutionally protected conduct because the trial court had determined *Sutter I* was a SLAPP in their attorney fees motion and South Sutter had alleged no new facts in *Sutter II*. They claimed South Sutter as a matter of law could not file what was effectively an amended complaint after the trial court determined it would have dismissed *Sutter I* as a SLAPP.[8]

The Miller defendants further argued that South Sutter filed *Sutter I* and *Sutter II* to prevent them from filing competing development applications with the County and participating in the approval process of South Sutter and

---

[8] The Miller defendants submitted into evidence by request for judicial notice all of the papers that had been filed in *Sutter I*.

the Measure M Group's specific plan application. The Miller defendants filed with the court a copy of the minutes of the County Board of Supervisors' meeting of April 24, 2007, where the board of supervisors rejected the Miller defendants' competing specific plan application. The board noted, however, that the Miller defendants could submit alternative land use plans or environmental comments during the environmental review of the Measure M Group's specific plan application. *Sutter II*, the Miller defendants argued, aimed to stop them from participating in that process.

The Miller defendants also claimed *Sutter II*, when considered on its own merits, failed to survive the new anti-SLAPP motion as South Sutter failed to show a probability of success on the merits against them. South Sutter had no claim against the Miller defendants because they were not parties to the Option Agreement between South Sutter and Odysseus Farms. Even if South Sutter had a claim against the Miller defendants pursuant to section 12.1 of the Option Agreement, the provision allegedly granting South Sutter an exclusive option in the Other Property, that claim had not ripened because South Sutter had not fulfilled section 12.1's condition precedent for the option to come into existence.

Opposing the anti-SLAPP motion in *Sutter II*, South Sutter initially claimed the Miller defendants had failed to file the motion in a timely matter. They argued the motion was to be filed within 60 days of service of the complaint, and it had been filed more than 60 days after the *Sutter II* complaint had been served, excluding the time when the action was transferred to Sutter County.

On the merits of the motion, South Sutter argued *Sutter II* did not arise from an act in furtherance of the Miller defendants' speech and petition rights, but rather arose from a controversy over property and contract rights; specifically, the two option agreements and the rights under each. South Sutter asserted that any exercise of constitutional rights by the Miller defendants was incidental to the contract dispute.

South Sutter also argued the Miller defendants could not rely on the trial court's attorney fees order in *Sutter I* to establish their prima facie showing in the anti-SLAPP motion in *Sutter II*. *Sutter II* involved a different cause of action, one for declaratory relief, and the trial court had stated its ruling on the merits of the anti-SLAPP motion in *Sutter I* was limited to its determination for awarding fees.

Additionally, South Sutter argued it had substantiated a legally sufficient claim to survive an anti-SLAPP motion. It allegedly had established the minimal merit required to survive an anti-SLAPP motion against a complaint

for declaratory relief by demonstrating the existence of a controversy over the meaning of the Option Agreement. Furthermore, the Miller defendants were indispensible parties to South Sutter's breach of contract action against the Leal defendants. If South Sutter prevailed against the Leal defendants and sought specific performance of its alleged exclusive right under the Option Agreement to acquire the Other Property, any rights the Miller defendants purported to have in the Other Property would be injured.

## H. *Trial court's ruling on anti-SLAPP motion in* Sutter II

The trial court granted the anti-SLAPP motion to strike *Sutter II*. Initially, it ruled the Miller defendants had filed their anti-SLAPP motion in a timely manner. The transfer of venue started the 60-day time period anew, and the Miller defendants had filed their anti-SLAPP motion within 60 days after *Sutter II* was received by the Sutter County Superior Court.

The trial court determined the Miller defendants had met their prima facie burden of proving *Sutter II* arose from their exercise of constitutional rights of speech and petition. They established this by showing the primary right at issue in *Sutter II* is the same primary right that was at issue in *Sutter I*, and the action on that right had been determined in the attorney fees motion to have been a SLAPP. As a result, all *Sutter II* does is omit the allegations that led to the first anti-SLAPP motion, hoping a new filing will escape the fate of the first complaint.

Relying on *Simmons v. Allstate Ins. Co.* (2001) 92 Cal.App.4th 1068 [112 Cal.Rptr.2d 397] (*Simmons*), the trial court ruled that refiling the *Sutter I* complaint as *Sutter II* but without the offending allegations was improper because, as we held in *Simmons*, there is no provision in the anti-SLAPP statute for amending a complaint once a court finds the necessary connection to First Amendment rights. The trial court stated: "If this complaint arises from the same facts that amounted to public participation in the first complaint (even though the cause of action may be different), then it follows that this action should also be considered a SLAPP suit."

The trial court stated that even if *Sutter I* had not been filed, it would still conclude the Miller defendants had met their prima facie burden based on "the circumstances surrounding this complaint." The court did not provide additional analysis on this point.

The trial court also determined that South Sutter failed to demonstrate a probability of success on its declaratory relief claim against the Miller

defendants. Any claim South Sutter had for declaratory relief against the Miller defendants depended on South Sutter's rights under the Option Agreement regarding the Other Property and whether the Leal defendants could transfer the Other Property to the Miller defendants. The trial court ruled the Option Agreement and, in particular, section 12.1 of the Option Agreement, gave South Sutter no rights to the Other Property except as South Sutter may negotiate and purchase mitigation credits and conservation easements from the Leal defendants at some point in the future, and there was no evidence this had occurred. Thus, South Sutter was unlikely to obtain any declaratory relief regarding the Miller defendants' actions that involved the Other Property.

We turn to South Sutter's arguments on appeal.[9]

## DISCUSSION

South Sutter claims the trial court erred when it granted the Miller defendants' anti-SLAPP motion against the *Sutter II* complaint. South Sutter contends the court erred when it (1) ruled the anti-SLAPP motion was filed timely when it was filed more than 60 days after the complaint had been served; and (2) granted the anti-SLAPP motion upon finding (a) the declaratory relief claim arose from the Miller defendants' constitutionally protected activity, and (b) South Sutter had failed to demonstrate a reasonable probability of success on the merits.

We affirm the trial court's rulings and judgment in favor of the Miller defendants. The trial court correctly determined the Miller defendants filed their anti-SLAPP motion on a timely basis. It correctly determined *Sutter II* arose from the Miller defendants' exercise of constitutional rights, as this issue was previously determined in the *Sutter I* attorney fees motion and because the facts indicated South Sutter's alleged injury arose from the Miller defendants' exercise of constitutional rights. The trial court also correctly determined South Sutter was not likely to succeed on the merits of its claims against the Miller defendants because it has no legal interest in the Other Property the Leal defendants transferred to the Miller defendants.

## I

### *Timeliness of Anti-SLAPP Motion*

South Sutter argues the trial court abused its discretion when it determined the Miller defendants had filed their anti-SLAPP motion timely. South Sutter

---

[9] The Leal defendants did not join the anti-SLAPP motion in *Sutter II*, are not parties to this appeal and, as mentioned earlier, have been dismissed from this action.

claims the motion was filed after the 60-day statutory period for filing an anti-SLAPP motion had expired. It argues the trial court could not hear the motion because the Miller defendants failed to file a separate motion seeking leave to file their anti-SLAPP motion late. South Sutter also claims the court erred by tolling the time between service of the complaint after it was filed in Santa Clara County and Sutter County's receipt of the complaint, and by starting anew the 60-day period once Sutter County received the complaint.

We disagree with South Sutter's arguments. Because venue was changed and the parties incorporated the rules governing changes of venue into their stipulation transferring venue, the trial court did not abuse its discretion by starting the 60-day period anew upon Sutter County's notice of receipt of the case.

A. *Additional background information*

An anti-SLAPP motion "may be filed within 60 days of the service of the complaint or, in the court's discretion, at any later time upon terms it deems proper." (§ 425.16, subd. (f).) The Miller defendants accepted service of the *Sutter II* complaint on August 7, 2007, and service was effective as of that date. (§ 415.30, subd. (c).) If the 60-day period ran from service of the complaint, it ended on October 9, 2007. The Miller defendants filed their motion on December 12, 2007, 127 days after service of the complaint.

However, before the Miller defendants filed a responsive pleading, the parties entered into a stipulation to transfer venue from Santa Clara County to Sutter County on August 30, 2007. The stipulation was granted by order signed by the court on September 5, 2007. As part of their venue stipulation, the parties agreed the Miller defendants "shall respond to the Complaint as set forth in California Rule of Court 3.1326."[10]

Rule 3.1326 grants a defendant, who successfully obtains a change of venue, 30 calendar days from the date the receiving court mails notice of receipt of the case to "move to strike, demur, or otherwise plead if the defendant has not previously filed a response."

The Sutter County Superior Court mailed notice of the case's receipt on October 23, 2007. The 30-day period granted under rule 3.1326 for the Miller defendants to file a responsive pleading to the complaint thus expired on November 26, 2007.

---

[10] All further references to rules are to the California Rules of Court.

The Miller defendants timely filed a demurrer on November 19, 2007. The notice of hearing on the demurrer stated the demurrer was brought concurrently with an anti-SLAPP motion, but no anti-SLAPP motion was filed at that time.

The Miller defendants filed their anti-SLAPP motion on December 12, 2007. They did not seek leave of the court to file their motion.

At issue is when did the 60-day period for filing the anti-SLAPP motion begin and expire. If the 60-day period began to run upon service of the complaint and was not tolled for the time venue was transferred, the 60-day period would have expired on October 9, 2007. If the 60-day period began to run upon service of the complaint but was tolled for the time venue was transferred until the Sutter County court gave notice of receipt, the 60-day period would have expired on November 26, 2007, the same day the 30-day period to file a responsive pleading under rule 3.1326 expired. If, however, the 60-day period started anew from the date of Sutter County's notice of receipt of transfer, it expired on December 24, 2007, and the anti-SLAPP motion was timely filed.

The trial court ruled the anti-SLAPP motion was timely. It began the 60-day period anew on the date of the notice of receipt, October 23, 2007, and found the anti-SLAPP motion timely filed as it was filed within 60 days of that date. It determined that neither the time between service of the complaint and the date the venue stipulation was signed, nor the time between the signing of the stipulation and the Sutter County court's notice of receipt, would be included in the 60-day period.

B. *Analysis*

South Sutter claims the trial court erred. It argues the 60-day period ran from service of the complaint, was tolled only for the time the case was transferred from Santa Clara County to Sutter County, and thus expired on November 26, 2007. It claims the trial court abused its discretion by allowing the anti-SLAPP motion to be filed without the Miller defendants first seeking leave to file it late. It also argues the court acted without authority when it "restarted" the 60-day period upon the day the Sutter County court filed its notice of receipt.

We disagree. By invoking rule 3.1326 as governing the time to respond to the complaint, the parties effectively agreed the 60-day time period to file an anti-SLAPP motion would start anew upon Sutter County's notice of receiving the case.

A motion to change venue operates as a supersedeas or stay of proceedings. (*Pickwick Stages System v. Superior Court* (1934) 138 Cal.App. 448, 449 [32 P.2d 433].) Although venue in this case was changed by stipulation, the effect is the same. No court had jurisdiction to receive a responsive pleading, let alone entertain an anti-SLAPP motion, pending approval of the stipulation and transfer of the case.

Moreover, rule 3.1326 starts a new 30-day period for filing a responsive pleading. Because the Miller defendants had not filed a responsive pleading to the complaint as of the date Sutter County issued its notice of receipt, rule 3.1326 effectively changed the service date for that purpose. The Miller defendants thus had a new 30-day period of time, until November 26, 2007, to file a responsive pleading to the complaint.

It would be inconsistent with this rule not to start anew the 60-day period for filing an anti-SLAPP motion when venue was changed. Otherwise, we could possibly require a defendant to file an anti-SLAPP motion either before or concurrently with filing a responsive pleading after successfully obtaining a change of venue. The Legislature's provision of 30 additional days to file an anti-SLAPP motion indicates the Legislature would not have intended a party to be required to file an anti-SLAPP motion before or at the time of filing its responsive pleading.

We recognize rule 3.1326 mentions a "mo[tion] to strike" as one of the filings for which the defendant has 30 days to file after venue is transferred. However, an anti-SLAPP motion cannot be considered a mere motion to strike for purposes of rule 3.1326. By referring to the motions it addresses as akin to pleadings, rule 3.1326 addresses a defendant's ability to file an answer, or a demurrer or other motion such as a motion to strike that attacks the sufficiency or form of the complaint based on the face of the complaint. (See, e.g., § 437, which specifies that the grounds of a motion to strike must appear on the face of the complaint or be admissible by judicial notice.)

By contrast, a special motion to strike a SLAPP complaint is an evidentiary motion more akin to a summary judgment motion. It is decided not only on the pleadings, but also on "supporting and opposing affidavits stating the facts upon which the liability or defense is based." (§ 425.16, subd. (b)(2).) Because of the burden of gathering and preparing evidence for an anti-SLAPP motion, the Legislature obviously and reasonably intended to grant a defendant more time to prepare an anti-SLAPP motion than a responsive pleading.

*Morin v. Rosenthal* (2004) 122 Cal.App.4th 673 [19 Cal.Rptr.3d 149] (*Morin*), relied upon by the trial court, supports this interpretation. In that case, the defendants timely filed anti-SLAPP motions after the case had been removed to federal bankruptcy court. The bankruptcy court ultimately remanded the action and denied the anti-SLAPP motions without prejudice to refiling them in the superior court. More than 90 days elapsed after the remand before the defendants refiled their anti-SLAPP motions. In the interim, the defendants had sought to transfer the case to a different district of the trial court, and had successfully challenged the second trial judge assigned to their case. The defendants refiled their anti-SLAPP motions after these procedural actions, but the trial court determined the refiled motions were not timely filed and it refused to exercise its discretion to allow them to be refiled. It ruled the defendants had a new 60-day period to refile their motions from the date the action was remanded, but they had failed to file within that time. (*Id.* at pp. 677–679.)

The Second Appellate District held the trial court did not abuse its discretion when it concluded the defendants were entitled to a new 60-day period to file their anti-SLAPP motions, which commenced from the date the plaintiff gave notice of the remand. (*Morin, supra*, 122 Cal.App.4th at p. 679.) Writing for a unanimous court, Justice Johnson stated: "Courts occasionally have to massage statutory time limits for filings in order to accommodate unusual circumstances. The trial court's ruling starting the 60-day period after remand from the federal court strikes us as a reasonable accommodation." (*Ibid.*, fn. omitted.)[11]

This case presents a similar unusual circumstance, and we conclude the trial court's ruling is a reasonable interpretation and accommodation. By means of the parties' stipulation transferring venue before a responsive pleading had been filed, this action effectively started anew upon the filing of Sutter County's notice of receipt. The Miller defendants were thus entitled to a new 60-day period to file their anti-SLAPP motion.

Because the Miller defendants filed their motion within the new 60-day period, their motion is timely, and the trial court properly heard it without having first to grant defendants leave to file. We now proceed to the merits of the Miller defendants' anti-SLAPP motion against the *Sutter II* complaint.

---

[11] The *Morin* court also sustained the trial court's refusal to exercise its discretion to allow the defendants to file the anti-SLAPP motions late. (*Morin, supra*, 122 Cal.App.4th at p. 681.)

## II

### *Merits of Anti-SLAPP Motion in* Sutter II

South Sutter asserts the trial court erroneously granted the Miller defendants' anti-SLAPP motion in *Sutter II*. It claims the Miller defendants did not establish a prima facie claim that *Sutter II* arose from their exercise of constitutional rights. It also claims it submitted sufficient evidence of its likelihood of success on the merits and asserts the trial court erred in finding otherwise.

We disagree with South Sutter's arguments. As will be explained, South Sutter is estopped from challenging the constitutional nature of the Miller defendants' activities that gave rise to South Sutter's cause of action. Even if South Sutter was not estopped, the facts demonstrate its claim arose from the Miller defendants' exercise of constitutional rights. Additionally, South Sutter is not likely to succeed on the merits, as it failed to establish the basis for its claim, an exclusive interest to acquire the Other Property.

### A. *Standard of review*

Subdivision (b)(1) of section 425.16 sets forth the elements of an anti-SLAPP motion. It provides: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim."

"[S]ection 425.16 requires that a court engage in a two-step process when determining whether a defendant's anti-SLAPP motion should be granted. First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one 'arising from' protected activity. (§ 425.16, subd. (b)(1).) [Second, if] the court finds such a showing has been made, it then must consider whether the plaintiff has demonstrated a probability of prevailing on the claim. [Citation.]" (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 76 [124 Cal.Rptr.2d 519, 52 P.3d 695].)

"We review de novo a ruling on a special motion to strike under section 425.16. [Citation.] Thus, we apply our independent judgment, both to the issue of whether the cause of action arises from a protected activity and whether the plaintiff has shown a probability of prevailing on the claim. [Citation.]" (*Maranatha Corrections, LLC v. Department of Corrections & Rehabilitation* (2008) 158 Cal.App.4th 1075, 1084 [70 Cal.Rptr.3d 614].)

We turn to the first prong of the anti-SLAPP motion test, whether the Miller defendants have made a threshold showing that *Sutter II* arose from their protected activity of speech or petition. We conclude they have.

### B. Sutter II *arose from protected activities*

South Sutter claims the trial court erred in determining the Miller defendants had established a prima facie claim that *Sutter II* arose from their exercise of constitutional rights. South Sutter asserts that *Sutter II* does not allege any speech or petitioning activity by the Miller defendants that gives rise to this action. It claims *Sutter II* arises primarily from a contractual dispute over property rights. It argues the trial court erred when, instead of recognizing these facts, it applied a primary right theory and the holding of *Simmons, supra*, 92 Cal.App.4th 1068, to determine *Sutter II* arose from the same exercise of constitutional rights by the Miller defendants as was alleged in *Sutter I*.

South Sutter also argues the trial court erred when it relied upon the *Sutter I* attorney fees order to conclude the Miller defendants had satisfied their prima facie burden in *Sutter II*. It claims the attorney fees motion was limited in scope and application to determining that the Miller defendants were prevailing parties only for purposes of an award of attorney fees and costs. It also argues that *Sutter II* is not based on the same facts and causes of action as *Sutter I*.

Alternatively, South Sutter claims that even if *Sutter II* is a continuation of *Sutter I*'s claims, *Sutter I* was not a SLAPP.

■ We reject South Sutter's arguments and conclude the Miller defendants made their required prima facie showing. Because the trial court previously determined on the attorney fees motion that *Sutter I* arose out of the Miller defendants' exercise of constitutional rights, a decision that is now final, and because *Sutter II* arises from the same set of facts as *Sutter I*, South Sutter is precluded by direct estoppel from relitigating that issue in *Sutter II*. Moreover, the allegations of *Sutter II*, when viewed with the evidence submitted by the Miller defendants in support of their anti-SLAPP motion, demonstrate *Sutter II* arose out of the Miller defendants' exercise of constitutional rights.

## 1. *Direct estoppel*[12]

To establish the first prong of determining whether the declaratory relief action is a SLAPP, the Miller defendants must show South Sutter's "cause of action" against them arose "from any act [by them] in furtherance of [their] right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue . . . ." (§ 425.16, subd. (b)(1).) By declaring *Sutter II* was based on the same "primary right" as *Sutter I*, and that the first prong of the anti-SLAPP test as it applied to that primary right had been determined on the merits in the *Sutter I* attorney fees motion, the trial court determined South Sutter was estopped from relitigating whether its cause of action arose from the Miller defendants' exercise of constitutional rights.

We agree with the trial court. The trial court in effect determined relitigating this issue was foreclosed by direct estoppel. We review the primary rights theory as it relates to defining a cause of action for purposes of the SLAPP statute, and explain that as it applies here, the theory works to bar relitigation of the first prong of the anti-SLAPP motion under the principle of direct estoppel.

■ For purposes of an anti-SLAPP motion, " '[a] "cause of action" is comprised of a "primary right" of the plaintiff, a corresponding "primary duty" of the defendant, and a wrongful act by the defendant constituting a breach of that duty.' " (*Marlin v. Aimco Venezia, LLC* (2007) 154 Cal.App.4th 154, 162 [64 Cal.Rptr.3d 488], fn. omitted, quoting *Crowley v. Katleman* (1994) 8 Cal.4th 666, 681 [34 Cal.Rptr.2d 386, 881 P.2d 1083] (*Crowley*).)

"The primary right theory is a theory of code pleading that has long been followed in California. It provides that a 'cause of action' is comprised of a 'primary right' of the plaintiff, a corresponding 'primary duty' of the defendant, and a wrongful act by the defendant constituting a breach of that duty.

---

[12] We invited the parties to submit supplemental briefing on the issue of whether the trial court's determination on the *Sutter I* attorney fees motion, that South Sutter's cause of action arose from the Miller defendants' exercise of constitutional rights, has any res judicata, collateral estoppel, or direct estoppel effect in this appeal. We did so in compliance with Government Code section 68081. When we invited the parties to file supplemental briefs, we recognized the *Sutter I* settlement agreement required that neither party assert the dismissal of *Sutter I* as an argument or defense in *Sutter II*, and thus we only invited the parties to comment. In their supplemental briefs, the parties argue over the extent to which the settlement agreement obligates them not to argue or assert the res judicata effect of the attorney fees order in this action, and whether and to what extent each of them have violated that provision of the settlement agreement in this matter. We need not address those issues, as it was this court, and not the parties, that raised the res judicata issue and invited the parties to address it in supplemental briefing. The parties acknowledge the settlement agreement, no matter how it may obligate *them*, does not prevent us from addressing the res judicata issue.

(*McKee* v. *Dodd* (1908) 152 Cal. 637, 641 [93 P. 854].) The most salient characteristic of a primary right is that it is indivisible: the violation of a single primary right gives rise to but a single cause of action. (*Slater* v. *Blackwood* (1975) 15 Cal.3d 791, 795 [126 Cal.Rptr. 225, 543 P.2d 593].) . . .

"As far as its content is concerned, the primary right is simply the plaintiff's right to be free from the particular injury suffered. (*Slater* v. *Blackwood, supra,* 15 Cal.3d 791, 795.) It must therefore be distinguished from the *legal theory* on which liability for that injury is premised: 'Even where there are multiple legal theories upon which recovery might be predicated, one injury gives rise to only one claim for relief.' (*Ibid.*) The primary right must also be distinguished from the *remedy* sought: 'The violation of one primary right constitutes a single cause of action, though it may entitle the injured party to many forms of relief, and the relief is not to be confounded with the cause of action, one not being determinative of the other.' (*Wulfjen* v. *Dolton* [(1944)] 24 Cal.2d 891, 895–896 [151 P.2d 846] . . . .)

■ "The primary right theory has a fairly narrow field of application. It is invoked most often when a plaintiff attempts to divide a primary right and enforce it in two suits. The theory prevents this result by either of two means: (1) if the first suit is still pending when the second is filed, the defendant in the second suit may plead that fact in abatement (Code Civ. Proc., § 430.10, subd. (c); *Wulfjen* v. *Dolton, supra,* 24 Cal.2d 891, 894–895); or (2) if the first suit has terminated in a judgment on the merits adverse to the plaintiff, the defendant in the second suit may set up that judgment as a bar under the principles of res judicata (*Panos* v. *Great Western Packing Co.* (1943) 21 Cal.2d 636, 638–640 [134 P.2d 242]). The latter application of the primary right theory appears to be most common: numerous cases hold that when there is only one primary right an adverse judgment in the first suit is a bar even though the second suit is based on a different theory (e.g., *Johnson* v. *American Airlines, Inc.* (1984) 157 Cal.App.3d 427, 432 [203 Cal.Rptr. 638]) or seeks a different remedy (e.g., *Stafford* v. *Yerge* (1954) 129 Cal.App.2d 165, 171 [276 P.2d 649])." (*Crowley, supra,* 8 Cal.4th at pp. 681–682, original italics, fn. omitted.)

■ The primary right theory also applies to the issue preclusion component of res judicata. "In contrast to claim preclusion, in which a prior judgment bars a second suit between the same parties, in issue preclusion '[t]he prior judgment is not a complete bar, but it "operates as an estoppel or conclusive adjudication as to such issues in the second action as were actually litigated and determined in the first action." [Citation.]' (*Clark* v. *Lesher* (1956) 46 Cal.2d 874, 880 [299 P.2d 865].) Most commonly, issue preclusion arises from successive suits on different claims; this is referred to

as collateral estoppel. If, however, the second action is on *the same claim* [(i.e., same cause of action or primary right)], . . . issue preclusion based on the earlier determination is described as 'direct estoppel.' (See Rest.2d Judgments, § 17, com. c, pp. 149–150; Rest.2d Judgments, § 27, com. b, pp. 251–252.) Both collateral and direct estoppel, 'like the related doctrine of res judicata [fn. omitted], ha[ve] the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation.' (*Parklane Hosiery Co.* v. *Shore* (1979) 439 U.S. 322, 326 [58 L.Ed.2d 552, 99 S.Ct. 645].)" (*Sabek, Inc. v. Engelhard Corp.* (1998) 65 Cal.App.4th 992, 997 [76 Cal.Rptr.2d 882], italics added (*Sabek*).)

Thus, if a second lawsuit arises from the same cause of action on which the first lawsuit was based, i.e., the same wrongful act by the defendant that breached the plaintiff's primary right, direct estoppel will bar relitigating issues in the second action that were litigated and determined in the first action. This occurs even though no final judgment on the merits was entered in the first lawsuit. (*Sabek, supra,* 65 Cal.App.4th at pp. 998–999.)

For example, direct estoppel has been utilized in cases where the trial court in the first action dismissed the first complaint on the basis of lack of personal jurisdiction, and the plaintiff's second complaint was subject to a motion to quash service on the same ground. No judgment on the merits was entered in the first action, so res judicata did not bar the filing of the second action. However, because the second action was based on the same primary right at issue in the first action, direct estoppel barred relitigation of the personal jurisdiction issue. (See *Sabek, supra,* 65 Cal.App.4th at pp. 998–999; *MIB, Inc. v. Superior Court* (1980) 106 Cal.App.3d 228, 234–235 [164 Cal.Rptr. 828].)

We are not aware of another reported opinion where a court applied direct estoppel in an anti-SLAPP motion against the second action where the plaintiff voluntarily dismissed the first action but the trial court ruled on the attorney fees motion that the first action arose from the defendant's exercise of constitutional rights. However, if the second action attacked by an anti-SLAPP motion is based on the same "cause of action" or primary right as the first action which was successfully attacked by an anti-SLAPP motion, we see no reason why direct estoppel should not apply.

Direct estoppel is determined according to certain threshold requirements: "First, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding. Second, this issue must have

been actually litigated in the former proceeding. Third, it must have been necessarily decided in the former proceeding. Fourth, the decision in the former proceeding must be final and on the merits. Finally, the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding." (*Lucido v. Superior Court* (1990) 51 Cal.3d 335, 341 [272 Cal.Rptr. 767, 795 P.2d 1223]; see *Sabek, supra*, 65 Cal.App.4th at pp. 997–998 [quoting and applying *Lucido* to the issue of direct estoppel].)

The trial court's determination on the merits of the anti-SLAPP motion in *Sutter I* as part of the attorney fees ruling satisfies these threshold requirements for applying direct estoppel. First, the issue here is identical to that decided on the merits in the *Sutter I* attorney fees motion. In both cases, the issue is whether South Sutter's cause of action arose from the Miller defendants' exercise of constitutional rights. The *Sutter II* complaint alleges a dispute exists between South Sutter and the Miller defendants, acting as agents of the Leal defendants, over whether the Option Agreement restricts who may seek development entitlements for the Option Property and the Other Property. If a dispute exists on this point, it is because the Miller defendants are about to seek development entitlements for these properties or they have already done so.

This is the same issue the trial court resolved when it determined the *Sutter I* attorney fees motion. The court determined South Sutter's cause of action in *Sutter I* arose from the Miller defendants' actions in seeking development entitlements that affected both the Other Property and the Option Property, and thus the cause of action arose from the Miller defendants' exercise of constitutional rights.

Second, this issue was actually litigated in the prior proceeding. For purposes of issue preclusion, "an issue was actually litigated in a prior proceeding if it was properly raised, submitted for determination, and determined in that proceeding." (*Hernandez v. City of Pomona* (2009) 46 Cal.4th 501, 511 [94 Cal.Rptr.3d 1, 207 P.3d 506].) The trial court on the *Sutter I* attorney fees motion convened an evidentiary hearing and heard the parties' arguments. Following its review of the evidence and consideration of the arguments, it announced its decision, concluding *Sutter I* arose from the Miller defendants' exercise of constitutional rights in seeking development entitlements. There was nothing left to be litigated on this issue.

Third, the issue was necessarily decided in the prior proceeding. "[T]he trial court's adjudication of the merits of a defendant's motion to strike is an essential predicate to ruling on the defendant's request for an

award of fees and costs." (*Liu v. Moore* (1999) 69 Cal.App.4th 745, 752 [81 Cal.Rptr.2d 807].) "The fee motion is wholly dependent upon a determination of the merits of the SLAPP motion. . . . [T]he trial court *is required to rule on the merits of the motion*, and to award attorney fees 'when a defendant demonstrates that plaintiff's action falls within the provisions of subdivision (b) and the plaintiff is unable to establish a reasonable probability of success. [Citation.]' [Citation.]" (*Pfeiffer Venice Properties v. Bernard* (2002) 101 Cal.App.4th 211, 218 [123 Cal.Rptr.2d 647], italics added.) There can be no dispute that the issue of whether South Sutter's action arose from the Miller defendants' exercise of their constitutional rights had to be decided in *Sutter I*.

 Fourth, the *Sutter I* court's decision on the issue is final and is on the merits. For purposes of issue preclusion, " ' "final judgment" includes any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded conclusive effect.' (Rest.2d Judgments, § 13 . . . ; [citations].)" (*Border Business Park, Inc. v. City of San Diego* (2006) 142 Cal.App.4th 1538, 1564 [49 Cal.Rptr.3d 259], italics omitted (*Border Business Park*).)

"A prior adjudication of an issue in another action may be deemed 'sufficiently firm' to be accorded preclusive effect based on the following factors: (1) whether the decision was not avowedly tentative; (2) whether the parties were fully heard; (3) whether the court supported its decision with a reasoned opinion; and (4) whether the decision was subject to an appeal. [Citations.]" (*Border Business Park, supra*, 142 Cal.App.4th at p. 1565.)

The determination of the first prong of the anti-SLAPP motion in the *Sutter I* attorney fees motion satisfies these criteria and is sufficiently final and on the merits to trigger direct estoppel in *Sutter II*. The determination was not tentative and the parties were fully heard. The court issued a formal order, supported by reasoned opinion, that was subject to an appeal.

Even though the parties entered into a settlement after the order was entered and the appeal was filed, the parties did not seek a stipulated reversal of the decision. Section 128 prevents us from reversing a duly entered judgment upon the parties' subsequent settlement unless we are requested to do so and we are able to make certain required findings. (§ 128, subd. (a)(8).) None of the parties in this action made any such request. As a result, the attorney fees decision remains a final judgment for direct estoppel purposes.

 Moreover, the decision was on the merits. In fact, it was required to be on the merits. "[A] defendant who is voluntarily dismissed, with or

without prejudice, after filing a section 425.16 motion to strike, is nevertheless *entitled to have the merits of such motion heard* as a predicate to a determination of the defendant's motion for attorney's fees and costs under subdivision (c) of that section." (*Liu v. Moore, supra,* 69 Cal.App.4th at p. 751, italics added.)

As was required of it, the trial court adjudicated the merits of the Miller defendants' anti-SLAPP motion in order to award attorney fees. It found on the merits that South Sutter's complaint arose from the Miller defendants' exercise of constitutional rights, and in particular their efforts to seek development entitlements for the Option Property and the Other Property.

Fifth, the party against whom preclusion is sought is the same party to the former proceeding. South Sutter is the plaintiff in both actions. Thus, the issue of whether South Sutter's action in *Sutter II* arose from the Miller defendants' exercise of constitutional rights is conclusively determined by direct estoppel. South Sutter has based *Sutter II* on the same violation of the primary right it claimed the Miller defendants violated in *Sutter I*, which the trial court in *Sutter I* determined arose from the exercise of constitutional rights, and that determination is now final.

South Sutter raises numerous arguments in opposition to this holding, none of which are persuasive. Citing *Ebensteiner Co., Inc. v. Chadmar Group* (2006) 143 Cal.App.4th 1174 [49 Cal.Rptr.3d 825] (*Ebensteiner*), South Sutter claims the settlement agreement effectively extinguished the *Sutter I* judgment and ended the dispute. *Ebensteiner*, however, said a settlement after entry of judgment ended the dispute for purposes of whether one of the parties could continue pursuing *an appeal* after the settlement agreement had been executed. (*Id.* at pp. 1180–1181.) *Ebensteiner* said nothing about a prior judgment's res judicata effect in a subsequent action where the first action was settled after the judgment was entered and the parties did not stipulate pursuant to section 128, subdivision (a)(8), to a reversal of the judgment. *Ebensteiner* did not concern the issue here and thus does not apply.

South Sutter claims section 128, subdivision (a)(8), cannot apply here because it applies by its terms only to "judgments," not an attorney fees order South Sutter claims was ancillary to the merits of the action. We conclude the attorney fees order in this case qualified as a judgment for purposes of section 128, just as it qualifies as a final judgment for purposes of applying direct estoppel.

■ A judgment in a civil matter "is the final determination of the rights of the parties in an action or proceeding." (§ 577.) Whether viewed as part of the *Sutter I* action or as a separate statutory proceeding, the attorney fees

order on the *Sutter I* anti-SLAPP motion was the final determination of the rights of the parties in *Sutter I*.

South Sutter claims the attorney fees order could not be a final determination of the parties' rights because treating it as such negates South Sutter's right under section 581 to voluntarily dismiss a complaint and operates as a retraxit. It does not.

"In common law, a retraxit was 'a voluntary renunciation by plaintiff in open court of his suit and cause thereof, and by it plaintiff forever loses his action.' [Citations.] In California, the same effect is now accomplished by a dismissal with prejudice. [Citations.]" (*Morris v. Blank* (2001) 94 Cal.App.4th 823, 828 [114 Cal.Rptr.2d 672].)

Applying direct estoppel here does not convert South Sutter's voluntary dismissal of *Sutter I* without prejudice into a dismissal with prejudice. Because no judgment was entered on the merits of the *Sutter I* complaint, South Sutter was free to file a second complaint. In addition, applying direct estoppel to the first prong of the anti-SLAPP motion does not bar South Sutter from prevailing on its claim. It simply subjects it to an earlier showing of proof, somewhat akin to a summary judgment motion, than would otherwise be required. There is no retraxit here.

South Sutter argues the attorney fees order nonetheless does not qualify for establishing a direct estoppel. It claims there was no final judgment on the merits of its *Sutter I* claims and the only issue actually litigated was whether the Miller defendants were prevailing parties. We have already shown this argument is incorrect. There need not be a judgment on the merits of the complaint in order to apply direct estoppel in the second action. Only the issue being argued in the second action had to be fully and finally litigated in the first action. We have already shown that was the case here.

South Sutter claims *Sutter II* is not based on the same cause of action as *Sutter I*, as it seeks only declaratory relief based on contractual and property rights granted under the Option Agreement, not the resolution of breach of contract and tort claims it filed in *Sutter I*. This argument ignores the concept of the "cause of action" at issue in an anti-SLAPP motion, as described in detail above. Our focus is the nature of the Miller defendants' activity, i.e., the "cause of action" or breach of a primary right, not the various legal theories South Sutter employed in *Sutter I* and *Sutter II* to recover on that cause of action. As a result, an anti-SLAPP motion may lie against a complaint for declaratory relief (see *CKE Restaurants, Inc. v. Moore*

(2008) 159 Cal.App.4th 262, 269–271 [70 Cal.Rptr.3d 921]), or one that targets both the performance of contractual obligations and an exercise of free speech rights. "[C]onduct alleged to constitute breach of contract may also come within constitutionally protected speech or petitioning. *The anti-SLAPP statute's definitional focus is not the form of the plaintiff's cause of action but, rather, the defendant's activity that gives rise to his or her asserted liability—and whether that activity constitutes protected speech or petitioning.* Evidently, '[t]he Legislature recognized that "all kinds of claims could achieve the objective of a SLAPP suit—to interfere with and burden the defendant's exercise of his or her rights." ' [Citation.] 'Considering the purpose of the [anti-SLAPP] provision, expressly stated, the nature or form of the action is not what is critical but rather that it is against a person who has exercised certain rights' [citation]." (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 92–93 [124 Cal.Rptr.2d 530, 52 P.3d 703], some italics added (*Navellier*).)

Thus, South Sutter cannot defeat the Miller defendants' prima facie showing simply by arguing that it did not allege tort actions in *Sutter II* that it alleged in *Sutter I*, or that it dismissed *Sutter I* and filed a new complaint. At issue are the Miller defendants' activities that gave rise to South Sutter's claims against the Miller defendants.

And *Sutter II* challenges the same activities by the Miller defendants that the *Sutter I* court determined were acts in exercise of constitutional rights—seeking development entitlements for the Option Property and the Other Property. Direct estoppel prevents us from having to waste our and the parties' resources by relitigating that issue.

Our decision in *Simmons, supra*, 92 Cal.App.4th 1068, on which the trial court relied, explains why direct estoppel is appropriately applied in this anti-SLAPP motion. In that case, we upheld a trial court's denial of the cross-complainant's request for leave to amend his cross-complaint made at the hearing on an anti-SLAPP motion against the cross-complaint where he faced an adverse tentative ruling. (*Ibid.*)

Writing for the unanimous court, Justice Callahan stated it would be inconsistent with the purpose of the SLAPP statute to allow the cross-complainant to amend. The SLAPP statute was designed to provide a quick dismissal remedy against certain meritless causes of action. Allowing a SLAPP plaintiff leave to amend once the trial court finds the prima facie showing has been met would be contrary to this purpose. "Instead of having to show a probability of success on the merits [and potentially being subject to quick dismissal], the SLAPP plaintiff would be able to go back to the drawing board with a second opportunity to disguise the vexatious nature of the suit through more artful pleading. This would trigger a second round of

pleadings, a fresh motion to strike, and inevitably another request for leave to amend." (*Simmons, supra*, 92 Cal.App.4th at p. 1073.)

That is exactly what has happened here. South Sutter tried to circumvent the effect of *Simmons* by dismissing *Sutter I* before the trial court ruled on the anti-SLAPP motion. However, the trial court was required to determine the merits of the anti-SLAPP motion, even though South Sutter had dismissed *Sutter I*, to resolve the attorney fees motion. Because the trial court concluded on the merits that South Sutter's claim against the Miller defendants arose from their exercise of constitutional rights, South Sutter cannot amend its pleading or file a new pleading based on the same act by the Miller defendants in an attempt to avoid the estoppel effect of the court's ruling.

No doubt the anti-SLAPP procedure is a statutory anomaly. But its terms provide a mechanism whereby a complaint's lack of merit can be determined on the merits after the complaint is dismissed. The procedure as it operated in this matter satisfied the requirements for direct estoppel on the issue of whether the cause of action arose from protected activity.[13]

### 2. Sutter II's *allegations attack the exercise of constitutional rights*

Even if we did not rely on direct estoppel, we still would conclude South Sutter's cause of action against the Miller defendants in *Sutter II* was based on the latter's exercise of their constitutional rights. In the declaratory relief action, South Sutter claims there is a controversy over whether the Miller defendants, as agents of the Leal defendants, can seek "entitlements" for the Option Property or for the Other Property.

The Option Agreement, from which South Sutter claims an exclusive right to seek entitlements for the Option Property, defines entitlements as government approvals "necessary or desirable for [South Sutter's] contemplated development of the [Option] Property, including, without limitation, the adoption of a specific plan, the resolution of habitat conservation plan mitigation issues, any development agreements with the County, the recordation of parcel maps for the [Option] Property and the recordation of final tract maps for the [Option] Property . . . ."

 Obviously, anyone applying for an entitlement as defined by the Option Agreement is exercising his constitutional right to petition the government. In this case, the Option Agreement defined "entitlement" as including a

---

[13] Alternatively, South Sutter asserts that even if *Sutter II* is based on the same cause of action as *Sutter I*, we cannot rely on estoppel because *Sutter I* was not a SLAPP on the merits. This issue, however, was decided in the *Sutter I* attorney fees ruling, a ruling which is now final. South Sutter is estopped from attempting to relitigate the merits of *Sutter I* here.

specific plan. A specific plan is a legislative enactment that implements the development policies of the city or county's general plan for all or part of the area covered by the general plan. (Gov. Code, § 65450.) It is subject to extensive public review and comment, review by other affected local agencies, and approval by the planning commission and the agency's legislative body; in this case, the board of supervisors. (Gov. Code, §§ 65351–65356.)

Here, the County Board of Supervisors sought one specific plan that would affect some 7,500 acres of land owned by multiple landowners. Each landowner had an interest in how the specific plan would affect his property, and no doubt there were competing interests. Nothing prevented a landowner from proposing a specific plan that benefited him and his land to the detriment of other landowners.

Indeed, that is what occurred here. The Miller defendants submitted a specific plan application to the County that competed with the application submitted by South Sutter and the Measure M Group. The Miller defendants submitted their application on December 21, 2006. The County denied this application on April 24, 2007. But by then, South Sutter had already filed *Sutter I* to challenge, among other actions, the Miller defendants' submittal of the competing plan application. Two months later, South Sutter filed *Sutter II* and again challenged the Miller defendants' ability to seek entitlements, i.e., governmental approvals like a specific plan, for the Option Property or the Other Property.

The Miller defendants' participation in the entitlement approval process obviously involves rights of speech and petition. So, too, would any attempt by them to seek other entitlements specific to the Other Property, or to oppose efforts by South Sutter to seek entitlements for the Option Property. In short, South Sutter effectively requests in *Sutter II* a declaration that the Miller defendants cannot engage in this political process. Such an action obviously arises from the Miller defendants' exercise of their constitutional rights of speech and petition.[14]

Relying on *Episcopal Church Cases* (2009) 45 Cal.4th 467 [87 Cal.Rptr.3d 275, 198 P.3d 66] (*Episcopal Church*), South Sutter argues the Miller defendants have not established their prima facie burden because this dispute arises out of rights granted under the Option Agreement, not the Miller defendants' exercise of constitutional rights. *Episcopal Church* is inapposite.

---

[14] The Miller defendants rely in part on arguments by South Sutter's counsel at the *Sutter I* attorney fees hearing regarding South Sutter's purposes for filing *Sutter II* as evidence that *Sutter II* arises from their exercise of constitutional rights. We give no weight to counsel's statements, as arguments by counsel are not evidence.

*Episcopal Church* concerned suits brought by the Protestant Episcopal Church of the United States and its Los Angeles diocese against a local parish that had disaffiliated itself from the larger church for its condoning the ordination of a priest who was homosexual. A dispute arose regarding which entity owned the local church building and the property on which the building stood after the parish seceded from the national church. The national church and the diocese sued to recover the parish's property. The parish filed an anti-SLAPP motion against the complaint. (*Episcopal Church, supra*, 45 Cal.4th at pp. 472–476.)

Our Supreme Court concluded the suit was not a SLAPP. It was not because it did not arise from the parish's protected activity. Although protected activity lurked in the background (the parish's voicing its reasons for leaving the national church), the suit arose from the dispute over property ownership. "In filing this action, the Los Angeles Diocese sought to resolve a *property dispute*. The property dispute is based on the fact that both sides claim ownership of the same property. This dispute, and not any protected activity, is 'the gravamen or principal thrust' of the action. [Citation.] The additional fact that protected activity may lurk in the background—and may explain why the rift between the parties arose in the first place—does not transform a property dispute into a SLAPP suit." (*Episcopal Church, supra*, 45 Cal.4th at pp. 477–478, original italics.)

South Sutter claims *Sutter II*, like *Episcopal Church*, arose from a dispute over property rights. It seeks declaratory relief only "with respect to contractual rights and competing property ownership claims."

However, unlike in *Episcopal Church*, it is the exercise of the Miller defendants' constitutional right to petition the government that is the alleged breach of contract. Effectively, South Sutter claims a dispute has arisen over whether the exercise of constitutional rights by the Miller defendants violates a contract. In this case, the protected activity does not just lurk in the background. It is the alleged cause of South Sutter's injury.

Moreover, where a cause of action alleges both protected and unprotected activity, the cause of action is subject to an anti-SLAPP motion unless the protected conduct is " ' "merely incidental" to the unprotected conduct.' " (*Raining Data Corp. v. Barrenechea* (2009) 175 Cal.App.4th 1363, 1369 [97 Cal.Rptr.3d 196].) South Sutter seeks declaratory relief not only regarding the Miller defendants' right to seek development entitlements, but also regarding the validity of the Option Agreement and the Miller Option Agreement. While the latter may not involve protected activity, the Miller defendants' petitioning activities to the board of supervisors are not merely incidental to that claim for declaratory relief. They are a major ground for

South Sutter's breach allegations as well as an independent ground for seeking declaratory relief. Such a claim of injury is not merely incidental to any alleged breach of contract.

For all these reasons, the Miller defendants have established, either as a matter of law under the application of direct estoppel or as a matter of fact, that *Sutter II* arises from their engaging in constitutionally protected activity. Their participation in the governmental entitlement process affecting both the Option Property and the Other Property were acts in furtherance of their constitutional rights of speech and petition. We thus must turn to the second prong of determining the anti-SLAPP motion: whether South Sutter has met its burden of showing likely success on the merits.

## C. *South Sutter's probability of prevailing on the merits*

The trial court determined South Sutter failed to introduce sufficient evidence on which a judgment of declaratory relief against the Miller defendants could be sustained. We agree with the trial court's decision.

■ "[S]ection 425.16 does not bar a plaintiff from litigating an action that arises out of the defendant's free speech or petitioning. It subjects to potential dismissal only those causes of action as to which the plaintiff is unable to show a probability of prevailing on the merits (§ 425.16, subd. (b)), a provision we have read as 'requiring the court to determine only if the plaintiff has stated and substantiated a legally sufficient claim' [citation]." (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 63 [124 Cal.Rptr.2d 507, 52 P.3d 685].) " 'Put another way, the plaintiff "must demonstrate that the complaint is both legally sufficient *and supported by a sufficient prima facie showing of facts to sustain a favorable judgment* if the evidence submitted by the plaintiff is credited." ' [Citation.]" (*Navellier, supra,* 29 Cal.4th at pp. 88–89, italics added.) The anti-SLAPP statute "poses no obstacle to suits that possess minimal merit." (*Id.* at p. 93.)

■ South Sutter claims it satisfied this second prong by demonstrating the existence of an actual controversy relating to the parties' legal rights and duties under the Option Agreement. However, the mere existence of a controversy is insufficient to overcome an anti-SLAPP motion against a claim for declaratory relief.

To defeat an anti-SLAPP motion, the plaintiff must also make a prima facie evidentiary showing to sustain a judgment in the plaintiff's favor. (*Navellier, supra,* 29 Cal.4th at pp. 88–89.) In other words, for a declaratory relief action to survive an anti-SLAPP motion, the plaintiff must introduce substantial evidence that would support a judgment of relief made in the plaintiff's favor.

Here, there is no substantial evidence on which a court could affirm a judgment in South Sutter's favor against the Miller defendants.

South Sutter's claims for declaratory relief against the Miller defendants all rest on its alleged exclusive rights under the Option Agreement to seek entitlements for the Option Property, to preclude the Leal defendants from entering into the Miller Option Agreement with the Miller defendants for the Other Property, and to prevent the Miller defendants from seeking entitlements on the Other Property. The evidence in the record, however, does not substantiate an award of declaratory relief to South Sutter against the Miller defendants on these grounds.

First, South Sutter has failed to show it is entitled to a declaration that it, and only it, can seek governmental entitlements for the Option Property to the exclusion of other landowners whose efforts to obtain entitlements for their properties may affect the Option Property. Certainly the Leal defendants gave South Sutter an exclusive but limited right to seek development approvals for its development of the Option Property, but that contractual authority could not foreclose the participation by any member of the public in a specific plan approval process that affected thousands of acres besides the Option Property, nor could it prevent a competing specific plan application from other landowners that potentially could have affected the Option Property.

By the County refusing to process but one specific plan application, all of the owners in the Industrial Reserve were in competition to shape the specific plan to their best interests. The County Board of Supervisors' process guaranteed others besides South Sutter would engage in the political conflict and would seek a specific plan entitlement that may have affected the Option Property. Nothing in the Option Agreement could give South Sutter the authority to thwart the Miller defendants' participation or the participation by any interested member of the public in the inherently political specific plan process.

Second, South Sutter has introduced no evidence showing it has exclusive rights under the Option Agreement to control or acquire all or part of the Other Property or that the Miller Option Agreement with the Miller defendants for the Other Property violated its rights to the Other Property.

Section 12.1 of the Option Agreement, on which South Sutter bases its claim to the Other Property, contains a condition precedent that must be satisfied before South Sutter gains any exclusive right to acquire the Other Property. The section states "it is possible" that Odysseus Farms and South Sutter "may" negotiate a conservation easement affecting the Other Property that could satisfy South Sutter's mitigation obligations. *If* an acceptable

easement is negotiated, *then* South Sutter shall have the exclusive right to purchase the easement associated with the Other Property.[15]

Section 12.1 is merely an unenforceable agreement to contemplate potential future agreements. Nothing in the language grants South Sutter any rights to the Other Property until it successfully first negotiates an easement with Odysseus Farms, and South Sutter has introduced no evidence establishing it has negotiated or entered into any type of easement agreement with Odysseus Farms involving the Other Property. Thus, South Sutter has failed to prove it has any exclusive rights to the Other Property which it can seek to enforce against the Miller defendants by declaratory relief or, for that matter, as necessary and indispensible parties to a similar claim for relief against the Leal defendants.

South Sutter argues section 12.1 actually gave it the exclusive right to negotiate for easements on the Other Property. It based this argument on a written declaration by Thomas Winn, a South Sutter partner. Winn stated the Option Agreement gave South Sutter an exclusive right to negotiate for a conservation easement on the Other Property throughout the term of the Option Agreement. He asserted that in order to be able to exercise this exclusive right, the Other Property needed to be in Odysseus Farms's control throughout the term.

---

[15] Section 12.1 of the Option Agreement reads in relevant part:

"A. [Odysseus Farms] owns other ranch land which is located in the area surrounding the [Option] Property (the '<u>Other Property</u>'), which Other Property may qualify as mitigation land under the [Natomas Basin Habitat Conservation Plan]. It is anticipated that [South Sutter] may be required to buy mitigation credits or set aside mitigation land in order to satisfy the requirements of the [Natomas Basin Habitat Conservation Plan] ('<u>HCP</u>').

"B. It is possible that [South Sutter] and [Odysseus Farms], together, may be able to negotiate a conservation easement ('<u>Conservation Easement</u>') in favor of the Department of Fish and Game (and/or other appropriate governmental agencies) which will satisfy the mitigation agreements at: (i) a location on the Other Land; (ii) and on terms and conditions, all of which must be satisfactory to [Odysseus Farms], in [Odysseus Farms's] sole and absolute discretion.

"C. Depending on the terms and conditions of the Conservation Easement which [Odysseus Farms] may elect to record the Conservation Easement and receive mitigation credits (the '<u>Mitigation Credits</u>') which may be simultaneously resold to [South Sutter] [*sic*]. It is also possible that [Odysseus Farms] may elect to record the Conservation Easement over part of the Other Property if and when [South Sutter] concurrently purchases the recorded Conservation Easement from [Odysseus Farms] and deeds said Conservation Easement to the Department of Fish and Game (and/or other appropriate governmental agencies).

"D. During the Term hereof, and *provided that an acceptable Conservation Easement has been negotiated*, [South Sutter] shall have the exclusive right, from time to time, to purchase any or all of the Mitigation Credits and/or the Conservation Easement associated with the Other Property from [Odysseus Farms] as and when the same is required by [South Sutter] . . . . In order to satisfy the mitigation requirements, it is anticipated that one-half (1/2) of an acre must be subject to the Conservation Easement for each one (1) acre which is developed." (Original underscoring, italics added.)

The Miller defendants objected to this testimony by Winn, claiming the testimony misstated the terms of the Option Agreement. The trial court sustained the Miller defendants' objection to Winn's testimony on this point. South Sutter claims this was error, but we conclude the trial court did not abuse its discretion in refusing to admit the parol evidence. The language of section 12.1 is clear and unambiguous, and the court was under no obligation to admit parol evidence that conflicted with the express terms of the Option Agreement. (Civ. Code, § 1638.)

Nothing in the language of section 12.1 indicates South Sutter's right to negotiate with Odysseus Farms was immediately exclusive or that Odysseus Farms was obligated to take no action regarding the Other Property throughout the term of the Option Agreement. Section 12.1 grants South Sutter an exclusive right to purchase an easement on the Other Property *"provided"* it has negotiated the easement's terms to Odysseus Farms's satisfaction. And the negotiation of such an easement is clearly optional. Unless an easement is negotiated, South Sutter has no rights in the Other Property.[16]

In summary, there is no evidence in the record on which we could sustain a judgment of declaratory relief holding that the Miller defendants have no right to seek entitlements, as defined by the Option Agreement, which could affect either the Option Property or the Other Property. Preventing participation in the entitlement process was outside the scope of the Option Agreement, and South Sutter had no rights in the Other Property that prevented the Miller defendants from participating in that process or gaining an interest in the Other Property.

Having found South Sutter's claim arose from the Miller defendants' exercise of their First Amendment rights in a political process, and finding South Sutter not likely, indeed, not able, to succeed on the merits of its declaratory relief action against the Miller defendants, we affirm the trial court's dismissal of the *Sutter II* complaint against the Miller defendants as a SLAPP prohibited by section 425.16.

## DISPOSITION

In case No. C058206 against the Miller defendants, the trial court's judgment is affirmed. Costs incurred on this appeal are awarded to the Miller defendants. (Cal. Rules of Court, rule 8.278(a).)

---

[16] South Sutter raises no argument against the trial court's determination that South Sutter could not obtain declaratory relief against the Miller defendants under the Option Agreement's right of first refusal, so we do not discuss that issue here as it may regard the Miller defendants.

In case No. C059554 against Anderson West, the appeal is dismissed as moot.

Hull, J., and Robie, J., concurred.