Filed 8/27/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| HEWLETT-PACKARD COMPANY, Plaintiff, Cross-Defendant and Respondent, v. ORACLE CORPORATION, Defendant, Cross-Complainant and Appellant. | H039507 (Santa Clara County Super. Ct. No. CV203163) |

Plaintiff Hewlett Packard Corporation (HP) brought this action against Oracle Corporation (Oracle) alleging that Oracle breached contractual and other duties by announcing that it would no longer make its software products compatible with certain HP hardware products. After the trial court found in a bifurcated trial that Oracle was indeed obligated to adapt its products to the HP systems, and on the very eve of a trial on the questions of breach and remedy, Oracle brought a motion under the anti-SLAPP statute, Code of Civil Procedure section 425.16 (§ 425.16), challenging one aspect of HP's proof of damages. The trial court denied the motion as untimely. Oracle immediately appealed, bringing all further proceedings to a halt. In a pattern that has become all too familiar to the appellate courts of this state, the appeal, like the motion engendering it, is utterly without merit. The motion was late under any reasonable construction of the facts, and it was quite properly denied because it could not possibly

achieve the purposes for which the anti-SLAPP statute was enacted. We will therefore affirm, declining to assess sanctions against Oracle only because we do not wish to further delay the long-overdue trial of the merits of this action.

**BACKGROUND**

### A. History of Cooperation in the Mission Critical Enterprise Server Market

For many years prior to 2010, Oracle and HP cooperated in the market for servers variously characterized as "high performance," "high-end enterprise," and "mission critical." Many of HP's sales in this category involved machines utilizing the Itanium processor, a product of Intel Corporation. According to an HP expert witness whose report Oracle cites on another point, HP sells two servers utilizing the Itanium processor—"Integrity" and "Superdome." The servers, with the HP-UX operating system—a proprietary derivative of Unix—were adapted "to perform mission-critical processes, such as large-scale technical, government, or business computing. Customers with these mission-critical computing needs . . . tend to be large businesses, universities, and government agencies." Oracle sold and supported software, including its industry-dominant database program, that it "ported" to run on these and competing systems.[1] The trial court found the relationship to have been "profitable for both parties."

### B. Acquisition of Sun; Hiring of Hurd; Ensuing Suit; Hurd Agreement

In 2010 this seemingly harmonious relationship was shaken by two events. First, in January, Oracle acquired Sun Microsystems, whose products included servers built around its SPARC processor and typically running Solaris, its own Unix-based operating system. The acquisition of these assets made Oracle a natural competitor with HP in the mission critical server market. As the trial court wrote, "This was a potential sea change in the relationship between the parties."

---

[1] As the trial court noted, to "port" software is to adapt it to run on a particular computing platform.

2

Then, about seven months after Oracle acquired Sun, a well-publicized chain of events resulted in the resignation of HP's chief executive officer, Mark Hurd, at the request of HP's board. A month later, Oracle hired Hurd as its co-president.

Expressing concern that Hurd could use HP trade secrets to the unfair advantage of Oracle—particularly in exploiting the newly acquired Sun assets to compete with HP—HP filed suit against Hurd. The dispute was quickly settled by a written agreement in late September, 2010, between HP and Oracle (the Hurd agreement). Its first enumerated paragraph, entitled "Reaffirmation of the Oracle-HP Partnership," states, "Oracle and HP reaffirm their commitment to their longstanding strategic relationship and their mutual desire to continue to support their mutual customers. Oracle will continue to offer its product suite on HP platforms, and HP will continue to support Oracle products (including Oracle Enterprise Linux and Oracle VM) on its hardware in a manner consistent with that partnership as it existed prior to Oracle's hiring of Hurd."

### C. Cessation of Porting; Initiation of Suit

According to the trial court's statement of decision, Oracle issued a press release on March 22, 2011—some six months after entering the Hurd agreement—stating that it had "decided to discontinue all software development on the Intel Itanium microprocessor."[2] This suggested that Oracle would no longer port new versions of its

---

[2] Although the press releases described in this paragraph provided the genesis for this lawsuit, neither party appears to have included them in the record on appeal. At least neither party cites us to them, and we have failed to find them, although the record is exceptionally difficult to navigate for a number of reasons, including that the text in the digital facsimiles thoughtfully supplied by the parties has been inadequately digitized and cannot be reliably searched. We find in one expert report a web address for what appear to be copies of the news releases. (See Oracle Stops All Software Development For Intel Itanium Microprocessor (Mar. 22, 2011) <http://www.oracle.com/us/corporate/press/346696> (as of Aug. 27, 2015); Oracle Issues Statement (Mar. 23, 2011) <http://www.oracle.com/us/corporate/press/349278, (as of Aug. 27. 2015.) However, while these documents appear to conform to the press releases as described in the record, they have not been properly brought before us.

3

software products to run on HP's Itanium systems. Any doubt on that score was eliminated when, as the court found, "Oracle identified on its website the current versions of its major products that were available on Itanium and the next versions of those products that would not be available on Itanium." Oracle apparently indicated, at or about the same time, that new versions of its software would continue to be "made available" on the competing "IBM Power and Sun S[PARC]" platforms.

On June 15, 2011, HP filed the complaint in this action alleging, among other things, that Oracle's announced refusal to continue porting its software to Itanium constituted a breach of the Hurd agreement, a violation of assurances made enforceable by promissory estoppel, and a breach of the covenant of good faith and fair dealing. It prayed for a declaration that Oracle was under a duty to continue porting its products to Itanium, for a decree compelling Oracle to specifically perform that obligation, and for damages. Oracle filed a cross-complaint and HP demurred. Oracle filed an amended cross-complaint asserting that the Itanium platform was doomed and that HP had artificially propped it up by making secret payments to Intel, thus misleading the public and Oracle as to its future viability. HP also demurred to this pleading, with results not disclosed by the record. The trial court deemed the matter a complex case. The parties filed cross-motions for summary judgment or summary adjudication, which the court apparently denied.

### D. Finding Against Oracle in Phase One; Vow to Appeal

The court conducted a bench trial under HP's declaratory relief cause of action on the question whether Oracle was under a duty to continue porting its products to Itanium. On August 1, 2012, the court issued a tentative ruling to the effect that Oracle was under such an obligation by virtue of both the Hurd agreement and other assurances Oracle had given to HP.

4

On the day the court issued its tentative ruling, Oracle responded with a press release framed as a quotation from an Oracle spokesperson. It stated that " '[n]othing in the court's preliminary opinion change[d] th[e] fact' " that, as asserted in Oracle's March 2011 press releases, " 'Itanium was approaching its end of life.' " The Hurd settlement was dismissed as " 'an unrelated employment agreement' " in which Oracle had not " 'give[n] up its fundamental right to make platform engineering decisions.' " The press release concluded, " 'We plan to appeal the Court's ruling while fully litigating our cross claims that HP misled both its partners and customers.' "

On August 28, the court issued a 43-page statement of decision ratifying and explaining its tentative ruling. It reserved for further trial "[t]he issues of both parties' performance pursuant to, and any breach of," the duties thus found. Also reserved was the question of the remedy, if any, to which HP was entitled.

### E. Resumption of Porting; Supplementation of Damages Theory

Prior to the trial in phase one, HP's experts on damages and causation had submitted reports premised on Oracle's own announcement that Itanium users would be unable to run new versions of Oracle products. On September 4, 2012, Oracle reversed itself on this point, issuing yet another press release stating that it would "continue building the latest versions of its database and other software covered by the judge's ruling to HP Itanium computers." Oracle did not indicate how long this undertaking could be expected to last.

Oracle's announcement muddied the waters on causation and damage.[3] Oracle's counsel wrote to the court on September 10, 2012, stating that HP's claims for "future damages" were no longer viable. As a result, he wrote, the parties had agreed that further

---

[3] We are not blind to the possibility that this consequence was not unintended.

5

discovery on damages and causation was necessary.[4]  The court manifestly agreed, and in December 2012, HP's experts promulgated supplemental reports opining that Oracle's announced intention to resume porting had not repaired the harm to HP caused by the March 2011 announcements.  The essential mechanism of damage, they opined, was widespread market uncertainty about the future viability of Itanium servers as a platform for Oracle applications.  Both witnesses identified the prospect of an eventual appeal by Oracle as a factor contributing to this uncertainty.  Damages expert Jonathan Orszag wrote that the "continued decline in Itanium revenue" reflected in then-current projections "shows that any favorable impact from the Phase I decision and the Oracle September 2012 announcement has been more than outweighed by the continuing negative impact . . . from the March 2011 Oracle Announcements and the continuing uncertainty created by Oracle's recent statements regarding its intention to appeal the Phase I decision."  He noted other factors bearing on customer uncertainty, including "serious concerns about . . . Oracle's commitment to the Itanium platform . . . and concerns about the level and quality of Oracle's future contractual performance."  Oracle's September 2012 statement failed to assuage these concerns, he reported, for several reasons including the previous press release "criticizing the court's tentative decision and vowing to appeal . . . ."  This vow, he observed, had been cited by industry analysts in forecasting a continued and probably irreversible decline in Itanium usage,

---

    **4**  Counsel wrote, "[T]he parties have agreed that on account of Oracle's announcement, HP will need to substantially revise its damages case.  That is because approximately $3.4 billion of the $3.9 billion in damages HP is seeking were (as of January 2012) 'future damages' based on the assumption that Oracle would not be porting in the future.  Since Oracle will timely perform on substantially all of its obligations—and 100% of its future obligations—HP's damages report obviously needs to be revised.  HP and Oracle agree this will require a new report from HP's damages expert, a response from Oracle's damages expert, and supplemental expert depositions, all of which must be completed before trial."

and in advising their readers to migrate elsewhere.[5]  Causation expert Bert Collins opined, similarly, that the ruling in phase one and Oracle's professed intention to resume porting to Itanium had not "provided customers with the reassurance they need in order for HP's Itanium-based servers to be their platform of choice."  He alluded to the facts that Oracle "also announced that it intends to appeal the Court's ruling, and . . . has filed a petition with the appeals court asking that it review certain alleged errors . . . ."[6]  The

---

[5]  He quoted one research firm as concluding that " 'HP's customers should not immediately assume that everything has returned to a "status quo ante."  Once Humpty Dumpty has fallen off the wall it is very difficult to put the pieces together again.' "  (Quoting Fichera, HP vs. Oracle—Despite Verdict In Favor Of HP, The End Is Not Yet In Sight (Forrester Blogs Aug. 3, 2012) http://blogs.forrester.com/richard_fichera/12-08-03-hp_vs_oracle_despite_verdict_in_favor_of_hp_the_end_is_not_yet_in_sight>, as accessed Oct. 12, 2012.)  That analysis went on to state, " 'Oracle will appeal, and there is no guarantee of the outcome . . . .  [¶]  So the game is not over, and before HP Integrity users relax and return to business as usual, they need to wait for the final resolution of the legal actions, as well as closure and specificity on what will be delivered and when in the case of an eventual HP victory.' "  (*Ibid*.)  An appendix to the report included another blog entry from the same source noting that, in view of the ongoing legal proceedings, " 'Oracle's future availability on Itanium and HP-UX is not yet assured, so we really cannot advise the large number of Oracle users who will require Oracle 12 and later versions to relax yet.' "  (Quoting Fichera, HP and Intel Announce Poulson and New Integrity Servers—Great News for a Select Few (Forrester Blogs Nov. 9, 2012) <http://blogs.forrester.com/richard_fichera/12-11-09-hp_and_intel_announce_poulson_and_new_integrity_servers_great_news_for_a_select_few>, as accessed Nov. 12, 2012.)

[6]  Oracle had filed a petition for writ of mandate on October 12, 2012, asking this court to overturn the trial court's decision in phase one.  We ultimately denied the petition without opinion.  (Ord. filed Jan. 31, 2013, in *Oracle Corporation v. Superior Court*, No. H038880.)

Oracle filed a second petition in this court on January 17, 2013, challenging the trial court's order allowing HP to submit supplemental expert reports as well as limitations on the supplemental discovery it allowed Oracle to conduct.  We denied the petition without opinion.  (Ord. filed Mar. 27, 2013, in *Oracle Corporation v. Superior Court*, No. H039210.)

7

prospect of appellate review, he noted, "naturally leaves customers uncertain about whether Oracle will continue to develop its future software products for Itanium-based servers."

### F. Anti-SLAPP Motion

On March 8, 2013, Oracle filed a motion under the anti-SLAPP statute, section 425.16, to strike "in whole or in relevant part," HP's causes of action for breach of contract, breach of the implied covenant of good faith and fair dealing, and promissory estoppel. The motion was set to be heard on April 5, 2013, one court day before trial on phase two was set to commence. The motion asserted that HP had "changed its damages theory" by relying on "customer uncertainty . . . resulting from Oracle's March 2011 announcement and its subsequent refusal to accept the [statement of decision] as the final, definitive ruling on the meaning of the Hurd Settlement Agreement." Oracle contended that this theory of damages arose in substantial part from its announced intention to appeal the trial court's determination on liability, which announcement was protected conduct under the anti-SLAPP act because it constituted an exercise or attempt to exercise Oracle's rights both to freedom of speech and to petition the government for redress of grievances. (See § 425.16, subd. (b)(1).)

The trial court denied the motion on the ground that it came after expiration of the 60-day time prescribed by the anti-SLAPP statute (§ 425.16, subd. (f)), and that Oracle had failed to furnish a sound justification for its late presentation. Oracle filed this appeal. HP moved to dismiss the appeal on the ground that it is frivolous. We postponed a determination on the motion pending briefing on the merits.

### ANALYSIS

### I. Introduction

As is recounted in many judicial opinions, the Legislature adopted the anti-SLAPP statute to address what it described as a "disturbing increase in lawsuits brought primarily

8

to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances." (§ 425.16, subd. (a).) The Legislature's intended target was the so-called "Strategic Lawsuit Against Public Participation, or SLAPP," which is " 'a civil lawsuit . . . aimed at preventing citizens from exercising their political rights or punishing those who have done so. " 'While SLAPP suits masquerade as ordinary lawsuits . . ., they are generally meritless suits brought primarily to chill the exercise of free speech or petition rights by the threat of severe economic sanctions against the defendant, and not to vindicate a legally cognizable right.' " [Citations.]' " (*Renewable Resources Coalition, Inc. v. Pebble Mines Corp.* (2013) 218 Cal.App.4th 384, 394, quoting *Simpson Strong-Tie Co., Inc. v. Gore* (2010) 49 Cal.4th 12, 21; see *Baharian-Mehr v. Smith* (2010) 189 Cal.App.4th 265, 270.)

An archetypal SLAPP would be an action in which "a developer sues neighborhood activists for having spoken out against the developer's project in some public forum." (*People ex reI. Lockyer v. Brar* (2004) 115 Cal.App.4th 1315, 1317 (*Brar*); see *Old Republic Construction Program Group v. Boccardo Law Firm, Inc.* (2014) 230 Cal.App.4th 859, 876 (*Old Republic*) ["core purpose" of the statute is to "remedy a very specific pattern by which *contestants in the arena of public affairs* were using meritless litigation as a device to silence and punish their adversaries"].) The statute sweeps far beyond this paradigm, however, reaching *any* lawsuit or claim found to arise from a party's actions in litigation, whether or not the activities—or the litigation— have any connection to an issue of public significance or interest, or to anything that might plausibly be labeled "public participation." As a result of this overbreadth, we have seen far more anti-SLAPP motions in garden-variety civil disputes than in cases actually resembling the paradigm. (See, e.g., *Kolar v. Donahue, McIntosh & Hammerton* (2006) 145 Cal.App.4th 1532, 1535, 1539-1540 [former clients' " 'garden variety legal malpractice action' "]; *Jespersen v. Zubiate-Beauchamp* (2003) 114 Cal.App.4th 624,

632 [same]; *Martinez v. Metabolife Internat., Inc.* (2003) 113 Cal.App.4th 181, 193, ["garden variety personal injury claims"].) Numerous reported decisions deal with anti-SLAPP motions originating in such quotidian contexts as landlord vs. tenant (e.g., *Ulkarim v. Westfield LLC* (2014) 227 Cal.App.4th 1266; *Feldman v. 1100 Park Lane Associates* (2008) 160 Cal.App.4th 1467); client vs. attorney; e.g., *Castleman v. Sagaser* (2013) 216 Cal.App.4th 48; employee vs. employer or coworker e.g., *Cho v. Chang* (2013) 219 Cal.App.4th 521; injured person vs. insurer e.g., *Old Republic*, *supra*, 230 Cal.App.4th 859; landowner vs. neighbor e.g, *M.F. Farming Co. v. Couch Distrib. Co.* (2012) 207 Cal.App.4th 180; *Paiva v. Nichols* (2008) 168 Cal.App.4th 1007; and marital disputes e.g., *Holland v. Jones* (2012) 210 Cal.App.4th 378; *G.R. v. Intelligator* (2010) 185 Cal.App.4th 606; *S.A. v. Maiden* (2014) 229 Cal.App.4th 27). Not surprisingly, many courts and commentators have attempted to draw attention—particularly legislative attention—to this "explosion of anti-SLAPP motions" and resulting appeals, and to particular "ways in which the anti-SLAPP procedure is being misused—and abused." (*Grewal v. Jammu* (2011) 191 Cal.App.4th 977, 998, 999 [marshaling authorities].)

A major reason for this explosion is that the statute rewards the filer of an unsuccessful anti-SLAPP motion with what one court has called a "free time-out" from further litigation in the trial court. (*Brar, supra,* 115 Cal.App.4th 1315, 1318.) The statute does this by entitling the unsuccessful movant to *immediately appeal* the denial of such a motion—even one like Oracle's, which wholly lacks merit, attacks only a small part of the plaintiff's case, and is heard nearly two years into the lawsuit, and on the day before a scheduled trial.[7] (§ 425.16, subd. (i) (§ 425.16(i)).) Such an appeal

---

[7] In a spirit of reciprocity, the Legislature also granted an immediate appeal to losing *plaintiffs*. (See *Grewal v. Jammu*, *supra*, 191 Cal.App.4th 977, 1000-1001, quoting Sen. Com. on Judiciary, Analysis of Assem. Bill No. 1675 (1999–2000 Reg. Sess.) as amended May 28, 1999, p. 3 [" 'The author is submitting amendments in Committee to clarify that the right of appeal would apply to motions granted or denied in order to assure that both the plaintiff and defendant are given equal rights to appeal an

automatically stays all further trial proceedings on causes of action "affected by the motion." (*Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180, 195, fn. 8; see *id.* at p. 186 (*Varian*).) This means that however unsound an anti-SLAPP motion may be, it will typically stop the entire lawsuit dead in its tracks until an appellate court completes its review.[8] A stark example is provided by *Brar*, where the defendant filed an anti-

adverse order.' "].) As a practical matter, however, many plaintiffs are unlikely to appreciate the gesture. If an anti-SLAPP order strikes the entire complaint, it effects a judgment of dismissal, which is appealable in its own right. (See *Melbostad v. Fisher* (2008) 165 Cal.App.4th 987, 994; Code Civ. Proc., § 904.1, subd. (a)(1).) Section 425.16(i) can thus affect plaintiffs only where an anti-SLAPP motion is granted as to part but not all of the plaintiff's case. In that situation, the most efficient path might be—and many plaintiffs might prefer—to litigate the remaining claims and seek appellate review of the SLAPP order, if necessary, on appeal from the resulting judgment. By granting an immediate appeal, the statute forces the plaintiff to choose between interrupting the prosecution of his or her case, and forfeiting appellate review of the SLAPP ruling. (See Code Civ. Proc., § 906 [authorizing review of "any intermediate ruling, proceeding, order or decision which involves the merits or necessarily affects the judgment or order appealed from," but adding, "The provisions of this section do not authorize the reviewing court to review any decision or order from which an appeal might have been taken."]; *Alfaro v. Community Housing Imp. System & Planning Ass'n, Inc.* (2009) 171 Cal.App.4th 1356, 1370-1371 [court "may not review an earlier appealable ruling" on appeal from later judgment]; *Strathvale Holdings v. E.B.H.* (2005) 126 Cal.App.4th 1241, 1248 ["Under section 906, on appeal, we may not review any order from which a separate appeal might have been taken."].)

[8] The Supreme Court recognized the potential for abuse flowing from the automatic stay of trial proceedings when an order denying an anti-SLAPP motion is appealed. (*Varian*, *supra*, 35 Cal.4th at pp. 195-196.) The court urged lower courts to do what they could to deter frivolous motions and appeals by dismissing them promptly and, where appropriate, awarding sanctions. (*Id.* at p. 196.) The court was "[h]opeful[]" that this would "somewhat reduce the risk of abuse." (*Ibid.*) But a prompt dismissal, even of a frivolous appeal, is not always feasible. In this case, HP's motion to dismiss the appeal was supported by four volumes of exhibits, which Oracle answered with another five volumes, with the result that the motion essentially duplicated the appeal itself. Top-drawer legal representation, such as both parties have engaged here, can obscure the core frivolousness of an appeal beneath layers of artful obfuscation which only the most painstaking examination can peel away. And where the stakes are high enough—as they certainly are here, judging from the multi-billion-dollar figures put forward by HP's

11

SLAPP motion even though, as an enforcement action brought by the Attorney General, the matter was *categorically exempt* from the anti-SLAPP law. (*Brar, supra,* 115 Cal.App.4th at p. 1318, quoting Code Civ.Proc., § 425.16, subd. (d).) Faced with this seemingly impenetrable barrier to relief, the defendant offered only a tortured and "quite irrelevant" argument impugning the Attorney General's motives. (*Id*. at p. 1319) The court, found " 'brought for reasons of delay' virtually tattooed on [the appeal's] forehead," illustrating the fact that "under a rule of automatic stay . . . the incentive to appeal even the denial of a patently *frivolous* anti-SLAPP motion is overwhelming." (*Ibid*.)

Nearly a decade later, the pattern decried in *Brar* had become so familiar that one court opened an opinion with a weary protest: "Another appeal in an anti-SLAPP case. Another appeal by a defendant whose anti-SLAPP motion failed below. Another appeal that, assuming it has no merit, will result in an inordinate delay of the plaintiff's case and cause him to incur more unnecessary attorney fees. [Citation.] And no merit it has." (*Moriarty v. Laramar Management Corp.* (2014) 224 Cal.App.4th 125, 133, citation omitted.) Another court was described as "exasperated" by a motion that advanced " '[n]either the public's nor defendant's right to participate.' " (*Grewal v. Jammu*, *supra*, 191 Cal.App.4th 977, 997, 998, quoting *Moran v. Endres* (2006) 135 Cal.App.4th 952, 955.)

The statute contains a provision apparently intended to limit this kind of abuse: "The special motion may be filed within 60 days of the service of the complaint or, in the court's discretion, at any later time upon terms it deems proper." (§ 425.16, subd. (f) (§ 425.16(f)).) In other words, the defendant is only entitled to "file[]" such a motion within 60 days of service; thereafter filing may be allowed, or not, in the trial court's

experts on damages—the threat or even the certain prospect of sanctions may not alter the economic calculus that makes an anti-SLAPP motion, and ensuing appeal, so attractive.

12

discretion. This language might be readily understood to mean that a trial court *need not entertain*, but can instead *refuse to hear*, a motion filed outside the 60 days. And indeed, some courts have suggested that this provision empowers a trial court to require advance leave before the defendant is permitted to file such a motion. (See *Platypus Wear, Inc. v. Goldberg* (2008) 166 Cal.App.4th 772, 775 ["A party may not file an anti-SLAPP motion more than 60 days after the filing of the complaint, unless the trial court affirmatively exercises its discretion to allow a late filing."]; *Olsen v. Harbison* (2005) 134 Cal.App.4th 278, 286 ["The statute expressly provides that a late anti-SLAPP motion shall not be filed unless the court affirmatively exercises discretion to permit it to be filed."]; *Kunysz v. Sandler* (2007) 146 Cal.App.4th 1540, 1543 [citing failure to seek leave as one of several defects]; *South Sutter, LLC v. LJ Sutter Partners, L.P.* (2011) 193 Cal.App.4th 634, 653, 654 (*South Sutter*) [implying that failure to seek leave could be fatal, but finding motion there timely]; but see *Chitsazzadeh v. Kramer & Kaslow* (2011) 199 Cal.App.4th 676, 684 (*Chitsazzadeh*) [failure to seek leave not fatal if court elects to entertain late motion].) HP asked the court below to follow these suggestions and frame its order as a denial of leave to file the motion. Such an order would not be immediately appealable under the terms of the statute. The same would seem to be true of an order striking an anti-SLAPP motion as untimely and unsupported by sufficient cause to permit late filing.[9]

Here, the trial court adopted a more streamlined approach: It *heard* the motion, and then "denied" it on grounds of untimeliness, concluding that good cause had not been

---

[9] But see *Chitsazzadeh*, *supra*, 199 Cal.App.4th 676, 680, fn. 2, where the court elected without explanation to "regard" an order striking a late anti-SLAPP motion "as a denial of the motion, and therefore an appealable order." We question whether that approach conforms to either the letter or the spirit of the statute. It seems to us that appellate recognition of a power in trial courts to strike untimely anti-SLAPP motions would go far to curb the abuses observed in this and many other cases.

13

shown for a belated hearing.  While entirely suitable in a more conventional procedural setting, this approach produced the regrettable consequence of granting Oracle the "free time-out" condemned in *Brar*, *supra*, 115 Cal.App.4th 1315, 1318.  Because the statute plainly authorizes an appeal from "[a]n order granting or denying a special motion to strike," (§ 425.16(i))we have no choice but to conclude that the order is appealable, and that we are vested with jurisdiction to decide the appeal.

## II. *The Trial Court's Decision Not To Entertain the Motion Cannot Be Overturned Unless It Contravened the Purposes and Policy of the Act*

As already noted, the statute vests the trial court with discretion to entertain an anti-SLAPP motion proffered after expiration of the 60-day period.  (§ 425.16(f) [motion "may be filed . . . in the court's discretion, at any later time"].)  The question here is whether the trial court, by refusing to entertain Oracle's motion on the merits, abused the discretion thus vested in it.  "Discretion" refers to a zone of latitude within which a trial court's actions must be upheld on appeal.  (See *Miyamoto v. Department of Motor Vehicles* (2009) 176 Cal.App.4th 1210, 1222 (conc. opn. of Rushing, P.J.).)  "The legal principles that govern the subject of discretionary action vary greatly with context. [Citation.]  They are derived from the common law or statutes under which discretion is conferred." (*City of Sacramento v. Drew* (1989) 207 Cal.App.3d 1287, 1298.)

In the anti-SLAPP context, courts have identified two particular ways in which a refusal to entertain a late anti-SLAPP motion might be shown to constitute an abuse of discretion:  (1) if "the grounds given by the court . . . are inconsistent with the substantive law of section 425.16," and (2) if the court's application of the statute to the facts of the case is "outside the range of discretion conferred upon the trial court under that statute, *read in light of its purposes and policy*." (*Olsen v. Harbison, supra,* 134 Cal.App.4th at p. 285, italics added.)  In other words, a claim that a trial court abused its discretion by failing to entertain a late anti-SLAPP motion requires the appellant to demonstrate that

14

the trial court applied the statute in a manner that is incompatible either with the statute's actual mandate, or with its "purposes and policy." (*Ibid.*)

We do not understand Oracle to claim that the trial court's ruling violated any express mandate of the statute. Its appellate challenge therefore necessarily rests on the premise that the refusal to entertain the motion on the merits did violence to the statute's purpose and policy. This premise cannot be sustained.

### III. The Motion Was Properly Denied Because It Could Not Efficiently Dispose of Any Substantial Part of the Action and Could Only Delay a Final Determination and Magnify the Costs to Both Parties

#### A. The Purpose of the Statute Is To Promptly Dispose of Qualifying Causes of Action and Thereby Spare the Defendant from the Costs of a Successful Defense Under Conventional Procedures

The overarching objective of the anti-SLAPP statute is "to prevent and deter" lawsuits chilling speech and petition rights. (*Varian*, *supra*, 35 Cal.4th 180, 192.) "Because these meritless lawsuits seek to deplete 'the defendant's energy' and drain 'his or her resources' [citation], the Legislature sought ' "to prevent SLAPPs by *ending them early and without great cost to the SLAPP target*" ' [citation]. Section 425.16 therefore establishes a procedure where the trial court evaluates the merits of the lawsuit using a summary judgment-like procedure a*t an early stage of the litigation.* [Citation.]" (*Ibid.*, italics added; see *Lam v. Ngo* (2001) 91 Cal.App.4th 832, 841 (*Lam*) ["whole purpose" of statute is "to provide a mechanism for the *early* termination of claims that are improperly aimed at the exercise of free speech or the right of petition"]; *id.* at p. 844 ["purpose is to weed out meritless 'claims' at an early stage"]; *Castleman v. Sagaser, supra,* 216 Cal.App.4th at p. 489 [motion "allows the trial court to evaluate the lawsuit at an early stage"].)

A late anti-SLAPP motion cannot fulfill the statutory purpose if it is not brought until after the parties have incurred substantial expense. Recognition of this fact is

15

implicit in the 60-day requirement, which entitles a defendant to use the statute's "special" procedure (§ 425.16, subd. (b)(1)) only by bringing the motion early enough to avoid the cost of resolving the case by more conventional means.  (*Chitsazzadeh*, *supra*, 199 Cal.App.4th at p. 682 ["The purpose of these timing requirements is to facilitate the dismissal of an action subject to a special motion to strike early in the litigation so as to minimize the cost to the defendant."]; see *Varian*, *supra*, 35 Cal.4th at p. 192, quoting *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 65 ["the 'short time frame for anti-SLAPP filings and hearings' and the 'stay of discovery' pending resolution of the motion evidences the Legislature's intent to minimize the litigation costs of SLAPP targets"].)  By failing to act within this time, a defendant incurs costs—and permits the plaintiff to incur costs—that a timely motion might be able to avert.  As these costs accumulate in the course of conventional discovery and motion practice, the capacity of an anti-SLAPP motion to satisfy the statutory purpose diminishes.  And as the utility of the motion diminishes, so does the justification for the statute's deviations from more conventional modes of disposition.  It is therefore to be expected that every case will come to a point beyond which an anti-SLAPP motion simply cannot perform its intended function.  If such a motion is untimely—as it will be in the absence of some event which has reopened the 60-day period—the trial court cannot abuse its discretion by refusing to hear it.

### B.  The Motion Was Too Late To Accomplish the Statutory Objectives

When the trial court made the order under review, this case had clearly passed the point just described.  Oracle's motion was brought, by our reckoning, at least 618 days after the 60-day period began to run, and 558 days after it ended.[10]  In fact the motion could not have been brought any later:  it was heard on *the last court day before trial*.

---

[10]  These figures assume the complaint was served no later than June 28, 2011, when Oracle filed a notice of appearance.  On that assumption, the 60 day period expired no later than August 29, 2011.  The anti-SLAPP motion was filed on March 8, 2013.

16

We have found no authority suggesting that a defendant may be entitled to have an anti-SLAPP motion heard after such a delay. On the contrary, much shorter lapses of time have been held to justify a refusal to entertain anti-SLAPP motions on the merits. (See, e.g., *Chitsazzadeh*, *supra*, 199 Cal.App.4th 676, 680-681 [motion properly denied as untimely where 113 days elapsed between service of complaint and filing of motion]; *Morin v. Rosenthal* (2004) 122 Cal.App.4th 673 [no abuse of discretion to deny as untimely motions filed 90 days after remand from federal bankruptcy court]; *Kunysz v. Sandler, supra,* 146 Cal.App.4th 1540, [no abuse of discretion to deny, partly on timeliness grounds, motion for reconsideration filed some 10 months after initial timely motion]; *Olsen v. Harbison, supra,* 134 Cal.App.4th at pp. 282, 283 [appeal dismissed as frivolous where motion filed 278 days after service].)

The only case we have found rivaling this one in the degree of the motion's lateness is *Platypus Wear, Inc. v. Goldberg, supra,* 166 Cal.App.4th 772, where some two years elapsed between the filing of the complaint and the defendant's application for leave to file a late anti-SLAPP motion. The trial court granted the application and entertained the anti-SLAPP motion, but then denied it on the merits, triggering the inevitable appeal. The court was held to have abused its discretion by deciding to *hear* the motion.

At the same time, we are aware of no case holding that a trial court abused its discretion by *denying* an anti-SLAPP motion, or refusing to hear it, after the 60 days had passed. Here the statutory period had elapsed roughly 10 times over. Given that extraordinary delay, it would require a comparably extraordinary showing to make even a colorable claim that the trial court abused its discretion by refusing to entertain the motion on the merits.

As previously noted, an anti-SLAPP motion cannot fulfill the statutory purpose, and may indeed subvert that purpose, if the parties have already incurred substantial

17

expense preparing the case for a more conventional disposition. Here, 632 days elapsed between HP's complaint and Oracle's anti-SLAPP motion. The online docket sheet, reproduced as an exhibit to HP's motion to dismiss, shows 483 entries—that is, 483 documents filed—over the period beginning with the complaint and ending with the anti-SLAPP motion. These of course included all of the pleadings: HP's complaint, Oracle's cross-complaint, HP's demurrer, Oracle's amended cross-complaint, and the parties' respective answers. In addition the docket reflects extensive—and extensively contested—discovery proceedings, including numerous motions. The parties also filed, by our count, eight motions to seal parts of the file. Another four motions to seal were filed by nonparty Intel Corporation. The parties filed cross-motions for summary judgment or summary adjudication. They also participated in numerous case management conferences, some of which are reflected in the 14 volumes of reporter's transcript—not including trial proceedings in phase one—contained in the appellate record.

Indeed, by the time Oracle's anti-SLAPP motion was brought, the court had already *tried* a major part of the case, and was on the verge of trying the rest. The docket includes many filings made in anticipation of the impending trial on phase 2, including proposed jury instructions and motions in limine. Again, the anti-SLAPP motion was heard *one court day* before that trial was to commence. Had that motion not been interposed, the entire case would presumably have been tried by now, and this court would be addressing *all* of the issues raised by an appeal from the resulting judgment, rather than an interruptive appeal that could at most resolve one issue while the rest of the case languished below. "Those whose rights and obligations depend on [a] judgment are [typically] best served by a single complete and final resolution of the issues presented. A right to an interlocutory appeal permits a party who benefits from delay to frustrate the goals of promptness and certainty of adjudication. The possibility that an order is

18

appealable can produce delay even where no one *wants* to impede the litigation. If the ruling *is* appealable, the aggrieved party *must* appeal or the right to contest it is lost. [Citations.] Thus every exception to the final judgment rule not only forges another weapon for the obstructive litigant but also requires a genuinely aggrieved party to choose between immediate appeal and the permanent loss of possibly meritorious objections." (*Kinoshita v. Horio* (1986) 186 Cal.App.3d 959, 967.)

Nor would the result have been substantially different if the trial court had entertained *and granted* the anti-SLAPP motion: the order would still have been likely to generate only delay and expense. Had the motion been granted, *HP* would have been entitled to take an immediate appeal. (§ 425.16(i).) As previously noted, HP might have been practically compelled to exercise this prerogative in order to avoid a later claim that it had forfeited any claim of error with respect to the granting of the anti-SLAPP motion. (See fn. 7, *ante*.)

All of this would have been quite apparent to the trial court when Oracle filed its eleventh-hour motion. There was simply no way a motion brought that late could achieve any significant reduction in the time and expense required to conclude the lawsuit. These facts alone bar a holding that refusal to entertain the motion on the merits was an abuse of discretion. The costs of defense had already been fully incurred, save for a trial which was destined to go forward—eventually—even if the motion was granted. The *only* likely effect of the motion would be to generate an expensive and time-consuming delay. That is all it could do—and all it has done.

***IV. Oracle's Claim of an Excuse for Delayed Filing Does Not Establish an Abuse of Discretion***

### A. An Excuse for Late Filing Does Not Deprive a Trial Court of Discretion to Refuse to Entertain a Late Anti-SLAPP Motion

Oracle insists that the record showed an adequate *excuse* for not filing the motion within the prescribed 60 days, and that the trial court's conclusion to the contrary is unsustainable. The first problem with this argument is that it avoids the central question raised by any late anti-SLAPP motion, which is the extent to which it can *serve the statutory purpose* of providing an *expedited disposition* of *meritless claims* burdening the exercise of speech and petition rights. The possibility that the defendant can point to some circumstantial justification for not bringing the motion sooner—like mistake, surprise, or excusable neglect—has little if any relevance where, as here, the motion could not expedite, but could only impede, an ultimate resolution.

The anti-SLAPP procedure is not intended and cannot serve as a mere symbolic affirmation of our society's commitment to public participation. It is an attempt to remedy a specific social ill, i.e., use of the litigation process to harass, intimidate, and punish those who seek to partake in public affairs. The justification for the statute's extraordinary procedures must rest on the *actual utility* of the procedure in particular cases. As we have said, where the parties have already incurred substantial expense and the case has progressed to its later stages, it is almost certain to be too late for the motion to accomplish any legitimate purpose. No showing of blamelessness or justification on the part of the defendant can restore what time has destroyed. All the motion can accomplish is delay.

It follows that even if Oracle had succeeded in establishing an excuse for not bringing the motion sooner, the trial court would not have been obliged to entertain the motion on the merits, and its refusal to do so would not constitute an abuse of discretion. Nor does Oracle offer any persuasive support to the contrary. It cites *Lam*, *supra*, 91

20

Cal.App.4th 832, where a trial court denied as untimely an anti-SLAPP motion filed 64 days after service of a first amended complaint. The court held that (1) the 60-day period runs anew from the filing of an amended complaint, at least where the preceding complaint "contained no anti-free-speech claims"[11] (*id.* at p. 841); and (2) service of such a pleading by mail extends the 60 days to 65 in accordance with Code of Civil Procedure section 1013, subdivision (a) (*id.* at pp. 842-843).

In short, the motion in *Lam* was held to be *timely*. The trial court therefore had no discretion to abuse, and its refusal to hear the motion was simple error. (See *Lam, supra*, 91 Cal.App.4th. at p. 840 [court has discretion to refuse to consider merits of late motion, but "must" reach merits if motion "is filed within the 60-day deadline"].) This makes the case entirely inapposite where, as here, the motion was brought beyond the deadline and the trial court was vested with *discretion* to refuse to hear it. The *Lam* court did not consider any excuse for late filing; indeed the defendant offered no excuse, properly speaking. The case therefore cannot stand for the proposition that such an excuse requires the trial court to entertain a late anti-SLAPP motion that cannot serve the purposes of the statute. As discussed in greater detail below (see pt. IV(B), *post*),

---

**11** The rule that an amended complaint reopens the time to file an anti-SLAPP motion is intended to prevent sharp practice by plaintiffs who might otherwise circumvent the statute by filing an initial complaint devoid of qualifying causes of action and then amend to add such claims after 60 days have passed. (See *Lam, supra*, 91 Cal.App.4th 832, 840-841 ["Causes of action subject to a special motion to strike could be held back from an original complaint . . . ."].) But a rule properly tailored to that objective would permit an amended pleading to extend or reopen the time limit only as to *newly pleaded* causes of action arising from protected conduct. A rule automatically reopening a case to anti-SLAPP proceedings upon the filing of *any* amendment permits defendants to forego an early motion, perhaps in recognition of its likely failure, and yet seize upon an amended pleading to file the same meritless motion later in the action, thereby securing the "free time-out" condemned in *Brar, supra*, 115 Cal.App.4th 1315, 1318.

21

Oracle's motion was late under any construction of the facts. Nothing in *Lam* required the trial court to hear it.

Much the same is true of *South Sutter*, *supra*, 193 Cal.App.4th 634, 653, also cited by Oracle. The trial court there was held not to have erred by "starting the 60-day period anew" upon the transfer of the case from another county. The holding rested on a stipulation transferring the action, in which the court found the parties had "effectively agreed" that transfer would restart the period. (*Id.* at pp. 654, 656.) Support for its conclusion was found in *Morin v. Rosenthal*, *supra*, 122 Cal.App.4th 673, where the trial court refused to hear an anti-SLAPP motion filed 90 days after a remand from bankruptcy court. The reviewing court concluded that the trial court had "acted within its discretion in denying the SLAPP motions as untimely," even though the defendants claimed that the motion could not have been heard earlier due to their own motions for intra-county transfer and to disqualify the assigned judge. (*Id.* at p. 681; see 680.) Nothing in either case supports a rule under which an excuse for late filing deprives the trial court of discretion to decline to hear a late anti-SLAPP motion that cannot serve the statutory objectives. That the tardiness of the motion is excusable is merely one factor that may justify, but need not compel, a decision to entertain it on the merits.

### B. Oracle Offered No Colorable Excuse for the Motion's Untimeliness

Even if an excuse for late filing could require that Oracle's motion be heard on the merits—a premise we emphatically reject—nothing in the record impeaches the trial court's finding that the excuse offered by Oracle was inadequate. This is true for a number of reasons, of which the most telling may be that Oracle waited more than 60 days *after the claimed occasion to file the motion came to its attention*. The gist of Oracle's argument is that HP's case did not implicate speech or petition rights, and thus did not furnish an occasion to file an anti-SLAPP motion, until HP cited Oracle's vow to appeal as a factor contributing to the market uncertainty that had depressed HP's Itanium-

based business. But HP first cited Oracle's avowed intention to appeal as a factor bearing on causation and damages no later than October 25, 2012, when HP filed its motion to serve supplemental expert reports on those subjects. The supporting memorandum quoted Oracle's press release of September 4, 2012, promising to " 'appeal the Court's ruling' " in phase one. HP noted that while Oracle had publicly resumed porting to Itanium, it had "reserve[d] the right to stop porting again if it prevails on appeal . . . ." A few pages later HP reiterated that Oracle had "reserved the right to stop porting again, not only vowing to appeal the Court's decision . . . but filing a Petition for Writ of Mandate" challenging the decision in phase one.

These remarks clearly presaged HP's contention that the promise to appeal was a factor contributing to HP's injuries. The supplemental expert reports, which were apparently served on December 10, 2012, made this contention explicit. HP's damages expert, Orszag, cited Oracle's announced intention to appeal, along with its filing of a writ petition in this court, as one of three "developments" since his original report having "the potential to affect my calculation of damages." Referring to a continuing decline in Itanium sales, he opined that "any favorable impact from the Phase 1 decision and the Oracle September 2012 announcement has been more than outweighed by the continuing negative impact on Itanium performance from the March 2011 Oracle Announcements and the continuing uncertainty created by Oracle's recent statements regarding its intention to appeal the Phase 1 decision." He noted reports from HP employees that "customers continued to have serious concerns about such factors as Oracle's commitment to the Itanium platform, the continuing delay and uncertainty created by Oracle's announced intention to appeal the Phase 1 decision, and concerns about the level and quality of Oracle's future contractual performance." Oracle's announced resumption of porting, reported these employees, was "insufficient to cause customers to change their decisions to migrate away from Itanium. In addition to the lengthy delay between

23

Oracle's March 2011 announcements and its September 2012 statement that it would resume porting to Itanium, customers are aware that Oracle made the statement only after losing Phase 1 of the trial, and shortly after Oracle had issued another statement criticizing the court's tentative decision and vowing to appeal the court's decision."

Causation expert Collins also cited the vow to appeal and the writ petition as factors contributing to customer doubts about the future viability of Itanium as a platform for Oracle applications. He wrote that Oracle's public disagreement with the trial court's ruling, together with the vow to appeal, "naturally leaves customers uncertain about whether Oracle will continue to develop its future software products for Itanium-based servers." He reported his understanding, gathered from HP sales directors, that "customers doubt that Oracle's stated intention to resume porting is going to last over the long-term and, therefore, they are migrating away from their Itanium-based platforms." Oracle's original announcement of non-support for Itanium, and the contentiousness manifested in its more recent announcements, including the vow to appeal, was leading customers to "understandably question and be concerned about whether the necessary degree of cooperation between Oracle and HP will exist in the future."

The anti-SLAPP motion was filed on March 8, 2013—88 days after the reports, and 134 days after HP's motion to prepare them. Assuming HP had the statutory 60 days from the later date to have an anti-SLAPP motion heard, plus five days for service by mail (see Code Civ. Proc., § 1013, subd. (a)), the motion was still at least 23 days late. Nothing in *Lam* suggests that the trial court would have abused its discretion there if the anti-SLAPP motion had been filed more than 65 days after service of the amended complaint.

In an attempt to address this fatal defect in its position, Oracle suggests that it could not have appreciated the importance of the vow to HP's case until it conducted the depositions of certain HP witnesses, which it did during the 65 days preceding the anti-

24

SLAPP motion. It cites the testimony of HP experts Collins and Orszag, but neither of them appears to have said anything materially different from what they had written in their supplemental reports. Perhaps for this reason, HP also cites the deposition testimony of David Donatelli, whom it describes as "the head of the HP business unit responsible for Itanium and a principal HP trial witness." Donatelli affirmed that "[a]s far as I know," it was "Oracle's choice to continue to exercise its right to contest HP's claims that has caused [HP's] damages."[12] This testimony differed from the supplemental expert reports only in its oversimplification of the revised damages theory—a subject on which Donatelli may not even be qualified to give an opinion, and on which he certainly was not authorized to speak with greater authority than HP's attorneys and the experts they had engaged. The implied assertion that his testimony somehow triggered a new 60-day period within which to file an anti-SLAPP motion is, at best, fanciful.

## CONCLUSION

The foregoing discussion does not exhaust the grounds on which the trial court's denial of Oracle's motion appears justified. Among other apparent defects in the motion are that it did not target a "cause of action" or "claim" but part of HP's intended proof of causation and damages. (See § 425.16, subds. (b)(1), (b)(3).) It was in effect a motion in limine. Indeed it duplicated in substance a motion in limine filed by Oracle in

---

[12] "Q. . . . And in September, early September, Oracle announced that it was complying with the Court's interpretation of the contract and resuming porting; right?

"A. Yes, while also under appeal.

"Q. Sure. Well, and—well, we'll get to that. So is it—is it Oracle's choice to continue to exercise its right to contest HP's claims that has caused your damages, as far as you're concerned?

"A. As far as I know, it is, yes."

25

anticipation of trial in phase two. That motion raised the same substantive issues, and had the matter not been derailed, would have produced a ruling that could be reviewed in due course along with any other issues remaining after trial. Regrettably, Oracle elected instead to resort to a procedure guaranteeing it a two-year respite from defending its conduct.

The case thus provides yet another illustration of the many ways in which the current anti-SLAPP statute produces unintended and even perverse results. It can be argued that the overbreadth of the statute has made the cure worse than the disease. To be sure, the statute achieves its intended purpose in true SLAPP cases, i.e., patently meritless suits brought to punish and harass adversaries in the public arena. But if it makes short work of suits like that, it makes much longer and more expensive work of many suits bearing no resemblance whatever to the targeted paradigm. It is as if a city had decided to cure an illness afflicting a few of its residents by lacing the water supply with a chemical that would indeed cure those sufferers, but would sicken a larger number of previously healthy citizens.

If HP's claims are just, then it has been deprived of justice for two years. That deprivation cannot be defended by citing the avowed purposes of section 425.16, for this suit does not and never did implicate the interests at the heart of that statute, i.e., the right to take part in public affairs without suffering the oppression and expense of a meritless lawsuit intended to punish and deter the exercise of political rights. We can only join a chorus of other courts in pleading with the Legislature to examine the real-world effects of the statute on ordinary civil disputes and to seek a ways to reduce the overwhelming temptations it currently offers to engage in abuses at least as injurious as those it was designed to correct.

In this regard, we offer the suggestion that one simple fix might substantially reduce the motivation to abuse the anti-SLAPP procedure: Limit the right to

26

interlocutory appeal to denials, and allow them only where the motion (1) is filed within the allotted 60 days, and (2) would—if granted—dispose of the entire action.  Where either of those conditions is lacking, the motion can rarely if ever achieve any real saving of time or money, and an appeal can only have the opposite effect.  Such an amendment would limit invocation of the statute to cases where it may serve its stated purpose and greatly reduce its tactical utility in many if not most of the situations where it is now being most sorely abused.

## DISPOSITION

The order denying Oracle's anti-SLAPP motion is affirmed.

               _____

                           RUSHING, P.J.

WE CONCUR:

_____

      ELIA, J.

_____

      MÁRQUEZ, J.

***Hewlett-Packard Company v. Oracle Corporation***
**H039507**

Trial Court:                                    Santa Clara County Superior Court
                                                Superior Court No.:  CV203163


Trial Judge:                                    The Honorable James P. Kleinberg


Attorneys for Defendant, Cross-                 Latham & Watkins
Complainant and Appellant
Oracle Corporation:                             Daniel M. Wall
                                                Alfred C. Pfeiffer, Jr.
                                                Sadik Huseny




Attorneys for Plaintiff, Cross-Defendant        Gibson, Dunn & Crutcher
and Respondent Hewlett-Packard Company:
                                                Jeffrey T. Thomas
                                                Samuel Liversidge
                                                Robert S. Frank, Jr.



*Hewlett-Packard Company v. Oracle Corporation*
**H039507**